No. 20900.

GWEN ZIMMERMAN, GEORGE AIELLO, ITALIAN VILLAGE, INC., AND LEDERMAN-ZIMMERMAN COMPANY *v.* PAULINE LOOSE, INDIVIDUALLY AND AS CONSERVATRIX OF THE ESTATE OF EDWARD LOOSE, INCOMPETENT.
(425 P.2d 803)

Decided March 6, 1967.

82

ADAMS & LOUGHLIN, for plaintiffs in error George Aiello and Gwen Zimmerman.

BEN KLEIN, for plaintiff in error Lederman-Zimmerman Company.

ALLOWAY & LOYE, for defendant in error.

*En Banc.*

MR. JUSTICE SUTTON delivered the opinion of the court.

THIS is an action in fraud allegedly committed in inducing Edward Loose, an incompetent, represented here by Pauline Loose, Conservatrix of his estate, to purchase a tavern operated under the name of the Italian Village, Inc. Defendants in the trial court were George Aiello, Gwen Zimmerman, Milton Berger, Vernon Nygaard, Harold Fitzsimmons, Donald Aymami, Italian Village, Inc., and Lederman-Zimmerman Co. The claims were dismissed against Aymami, Berger and Nygaard; and Harold Fitzsimmons died just prior to trial. Italian Village, Inc., although represented at the trial, does not appear here. Plaintiffs in error Aiello, Gwen Zimmerman and Lederman-Zimmerman Co. will be referred to by name or as defendants with reference to "Aiello" meaning the father George Aiello and to "Zimmerman" being Gwen Zimmerman. Defendants in error will be referred to by name or as plaintiffs.

On June 21, 1960, the Looses filed an action which among other relief sought $17,764 actual damages against all defendants, $1,000 further actual damages against Zimmerman and Fitzsimmons, and $5,000 exemplary damages. Following the trial to the court, Loose was awarded $17,764 damages against Aiello, Zimmerman, Lederman-Zimmerman Co. and Italian Village, Inc. The court specifically found that Edward Loose was an incompetent at the time of the transactions in question; that the defendants knew of his condition; that they took advantage of him and so were guilty of fraud.

The defendant Lederman-Zimmerman Co. urges ten

assignments of error which may be summarized into four grounds as follows:

(1) It was error to admit evidence relating to a company known as the 7655 Corporation and to Marvin Lederman as they were not parties to the action and their activities were outside the scope of the pleadings;

(2) Amendment of the complaint was allowed over the objection of a defendant;

(3) No continuance was granted; and,

(4) The judgment is contrary to the pleadings and to the evidence.

Defendants Aiello and Zimmerman further assign as error:

(1) That there was a failure to prove fraud by clear and convincing evidence; and,

(2) That there was an application of the wrong measure of damages. They assert that the proper formula should have been the difference between the actual value of the business at the time of sale and what its value would have been had the representations complained of been true.

The fact situation presented is a complicated one. In the summer of 1959 the Italian Village, Inc. owned a restaurant and bar located at 7655 W. Alameda, Lakewood, Colorado. The stock of this company was held by Kanellia Aiello, Winifred Fallico and George R. Aiello, the latter being a son of defendant Aiello. It appears that defendant Aiello held a $10,000 note and mortgage on the assets of the corporation as well as the lease on the property. On August 3, 1959, the corporation was sold to Vernon Nygaard for a total purchase price of $16,000, of which he paid $6,000 in cash, and the balance of $10,000 was paid by his promissory note secured by a mortgage on the stock, fixtures and furnishings. Both the note and the cash payment were delivered to the defendant Aiello rather than to his son.

Late in August 1959, Nygaard, after being in possession about three weeks, asked Fitzsimmons and Zimmerman,

who were both real estate brokers, to locate a purchaser for him, and also asked Aiello to protect his interest in the business while he was absent. His price for the business was what he had in it by then, *viz.*, $16,000 or $16,500. It was then that Fitzsimmons and Zimmerman contacted Edward Loose, took him to see the business, convinced him that it was a profitable one and arranged for him to purchase it. Aiello and Nygaard were also contacted and discussed the property with Loose. Though Aiello did not actually state that the business was profitable, Fitzsimmons indicated that the business took in $100 per day, and Nygaard said it was $250. Other portions of the record, however, show that the Italian Village sustained a loss of $7,326 during 1958 and approximately $5,800 during the first six months of 1959.

The initial purchase price to Loose was to be $19,500. Of this $500 was to be paid upon signing the initial agreement; $7,500 was to be in cash at the closing; and a note for $11,500 was to be given Aiello. The note was to be secured by a chattel mortgage on the furniture and fixtures and a pledge of the stock of the corporation. Thereafter Loose paid the initial $500 and at the closing turned over $5,500 cash which he had withdrawn from a joint savings account owned with Mrs. Loose. He also paid $1,524.80 for which he had cashed savings bonds and a further $25.20 in cash. At this time Edward Loose also executed three promissory notes, one for $2,100 to Vernon Nygaard, one for $4,750 to Aiello secured by a second mortgage on the furniture and fixtures, and a third for $11,500 to Aiello secured by a first mortgage, a pledge of stock and an assignment of a note from Donald Aymami to Loose in the amount of $8,500 secured by a second mortgage on the assets of the Club Bar — the latter being another Denver area tavern. At the closing Loose was given $800 in cash by Fitzsimmons. Loose also authorized Fitzsimmons and Berger, the latter being Aiello's attorney, to collect $1,000 due him

from one A. D. Jones. Berger later received a note for $1,100 from Jones which cancelled the latter's indebtedness to Loose. Thus, at the closing, Loose paid in cash, notes and assignments $26,100 instead of the agreed $19,500.

The Loose money was divided as follows: Nygaard received $3,900 in cash and the $2,100 note (and apparently a cancellation of his previous commitments), and Aiello received the two notes totaling $16,250 plus the assignment of the $8,500 Aymami note as security, with the balance of the cash unaccounted for. Defendant Aiello signed the purchase agreement for Nygaard as the latter was not present at the closing. Loose did not receive an assignment of the lease which remained in the name of Aiello, even though $2,400 of the price paid was purportedly a lease deposit.

Following the complex closing, Loose, a confirmed alcoholic, took over the management of the bar-restaurant on September 8, 1959. Apparently, he was unable to operate it competently, for on November 5, 1959, he contacted Zimmerman and requested that she find a new purchaser for the business. At that time Zimmerman was acting on behalf of a new company called the Lederman-Zimmerman Co., a real estate brokerage firm incorporated in October, 1959. The record discloses that the agent then obtained a two-month exclusive listing from Loose and said that she would locate a purchaser for the amount of his investment. Later in November, Zimmerman took over operation of the business in order, as she said, to try and keep it open so a sale could be made. Her actions in this respect were not as an agent of Lederman-Zimmerman Co.

The next chapter in this tale is that in December, 1959, Aiello, not having received payment on one of the Loose notes, sold the $8,500 note assigned to him as security to Aymami for $5,000, cancelling the $4,750 note from Loose and marking $3,750 paid on Loose's $11,500 note. The remainder of the $11,500 note, then

having a purported value of approximately $7,750, he sold to a Mr. Reano. Aiello next contacted George Newton, owner of the premises upon which Italian Village, Inc. was located and arranged to cancel the lease. Since Loose had not paid the rent for the four preceding months, a total of $1,500 was then due. Thereafter the lease was terminated in consideration of the cancellation of the rent then owing. Loose, however, was not notified of any of these post-possession transactions.

We next find that on December 24, 1959, Zimmerman and Marvin and Victor Lederman, the three owners of Lederman-Zimmerman Co., formed a new corporation called the 7655 Corporation. They also began negotiations with Newton for a lease of the same premises in which the Italian Village was located. Thereafter, a lease running to the 7655 Corporation was signed on December 31, 1959, and a liquor license was also obtained by the new corporation. During this period the exclusive listing agreement given Zimmerman by Loose was still in effect. Finally, the premises were occupied in January, 1960, by the 7655 Corporation in the same condition as when Loose purchased Italian Village, Inc. All the furniture and fixtures were still present, the evidence showing that most of these had belonged to Newton rather than to Italian Village. Apparently these were the same furniture and fixtures, however, on which Aiello had held chattel mortgages securing Loose's indebtedness to him.

Edward Loose was declared a mental incompetent on February 2, 1960. The record shows that he had sustained brain damage resulting from an extended period of heavy drinking. He had been drinking excessively during the summer and fall of 1959 and for several years prior to this. Expert medical testimony indicated that it was possible but highly improbable for him to have been sufficiently lucid to conduct business during the purchase period.

■■ It is contended that the Looses have failed to

prove fraud by clear and convincing evidence; however, the evidence in this record amply supports the trial court's findings in this regard. Fraud can be inferred from the surrounding facts and circumstances and from the condition of the parties. *Hinshaw v. Hinshaw,* 148 Colo. 262, 266, 365 P.2d 815 (1961); *Huber v. Boyle,* 98 Colo. 360, 56 P.2d 1333 (1936); 37 C.J.S. *Fraud* §§ 94 and 115. As was said in *Hinshaw,* the doctrine of fraud "* * * is designed to prevent one from taking covert advantage of the weakness or necessity of another."

■ As hereinafter appears, the applicable rule in the instant case is that contained in *Hinshaw* and *Huber.* First, however, we should briefly discuss the legal elements which must be shown to be present in order to establish fraud. Admittedly, there must be shown to be a representation or lack of information coupled with a duty to inform. These representations or lack of them must go to material facts and must be shown to be false or misleading. The party making them must have known they were false or be indifferent to their truth or falsity. Then, the party claiming the fraud must have relied upon the representations, have had the right to rely on them, have acted in accordance with the reliance and in doing so have been damaged. *Morrison v. Goodspeed,* 100 Colo. 470, 68 P.2d 458 (1937); *Pattridge v. Youmans,* 107 Colo. 122, 109 P.2d 646 (1941).

■■ The record in this case is replete with evidence of material misrepresentations made by certain defendants to Loose. For example, he was led to believe that he would receive a money-making business when in fact such was not true and those so representing knew it. Representations as to present and past earnings of a business have repeatedly been held to be material. *Hayden v. Perry,* 110 Colo. 347, 134 P.2d 212 (1943); *Spiess v. Brandt,* 230 Minn. 246, 41 N.W.2d 561 (1950). It is not a defense in a case like this, as defendants claim, that Loose had every opportunity to examine the books and that an ordinary prudent man would have done so

more carefully and so have discovered that this was a losing venture. The court must consider each case on its own merits as to the particular individual, his mentality, awareness and experience, in determining his ability and right to rely. *Hefferan v. Freebairn*, 34 Cal. 2d 715, 214 P.2d 386 (1950); *Jenness v. Moses Lake Development Co.*, 39 Wash. 2d 151, 234 P.2d 865, 870 (1951).

██ The trial court here found, and there is ample evidence to sustain the finding, that Loose was incompetent during the time in which the transactions in question took place. See *Harlow v. Kingston*, 169 Wis. 521, 173 N.W. 308 (1919). Even assuming that a reasonable man would not have relied upon the representations made here, this chronic alcoholic purchaser did rely upon them to his damage.

██ Nor is it a defense, as claimed by Aiello, that he did not actually state that the Italian Village made money. The evidence discloses a common design participated in by Aiello and Zimmerman, among others, to promote the sale in question to Loose and that Aiello actively participated in the sale itself. The fact that Aiello asserts that he made no misrepresentations does not relieve him of liability for "Everyone who enters into such a common design is in law a party to every act previously or subsequently done by any of the others in pursuance of it." *Western Homes v. Dist. Court*, 133 Colo. 304, 311, 296 P.2d 460 (1956).

Defendant Aiello also asserts that the trial court has confused him with his son who was initially the owner of the Italian Village, Inc. He claims that it was error to include him at all since he never held an interest in that business. The record, however, shows no confusion on this point. Aiello admittedly held notes and mortgages from all the owners of the business as the web was spun. He also was an active participant to some degree in matters connected with the lease and in dealing for Nygaard in the latter's absence. This record discloses that Aiello and Zimmerman were both in-

volved in the transaction every step of the way and both were instrumental in inducing Loose to purchase the property and later in relieving him of his interest.

 Where an incompetent or weak-minded person is involved, the inequality between the parties is properly considered as well as all the surrounding circumstances. *Ruffini v. Avara*, 121 Colo. 567, 220 P.2d 355 (1950); *Hanks v. McNeil Coal Corp.*, 114 Colo. 578, 168 P.2d 256 (1946). Inadequacy of consideration must also be considered. *Dittbrenner v. Myerson*, 114 Colo. 448, 167 P.2d 15 (1946). Here there were flagrant abuses in this regard. Loose was clearly defrauded.

As to the first three grounds for reversal urged by Lederman-Zimmerman Co., for reasons hereinafter set forth as to why this action should be dismissed as to it, due to the validity of its fourth ground, there is no reason to discuss such in this opinion.

 As to Lederman-Zimmerman Co.'s fourth ground, we agree that the evidence connecting that defendant to the fraud is, however, insufficient to warrant upholding that portion of the judgment. In this connection our attention is again directed to *Western Homes v. Dist. Court, supra,* by the Looses who contend that at all times after the formation of the Lederman-Zimmerman Co. in October, 1959, defendant Zimmerman was acting as an agent of the company. This, however, is not borne out by the record. The only action on her part which was taken as an agent of that company was that of obtaining the exclusive listing agreement. This in itself was not fraudulent, nor is there evidence that the company, or Zimmerman *when she was acting for the company*, participated in a scheme to defraud. This is so because all the other actions on her part were on her own behalf, or were as an agent of Loose, or as an agent of the 7655 Corporation; and all of these evidently were represented as such at the time. Legally, the 7655 Corporation, in obtaining the lease, liquor license and possession of the premises was not acting as an agent of

Lederman-Zimmerman Co. Though the two corporations have identical ownership, there is no evidence in the record of any connection between the two other than such ownership. There being insufficient evidence to uphold this portion of the judgment, this part of the case must be reversed and remanded with directions to dismiss the claim against Lederman-Zimmerman Co.

 The defendants also claim that the proper measure of damages was not applied. We have held, in *Otis & Co. v. Grimes*, 97 Colo. 219, 48 P.2d 788 (1935), that the measure of damages in an action in fraud is the difference between the actual value of the property purchased and what its value would have been had the representations been correct. That rule, however, is not applicable in this case because the fraudulent acts of the defendants Aiello and Zimmerman have resulted in Loose being deprived of the very property which they sold him. The correct measure of damages then is the actual loss suffered by Loose. As we compute this from the record, Loose's final total actually was at least $18,350.

The trial court awarded him the prayed for damages of $17,764, but there is no indication in its findings as to the method used by it in calculating such. Normally we would, under these circumstances, reverse with directions to the trial court to enter an award for the correct sum; however, since no cross-error was assigned on this ground and the sum awarded is less (rather than more) than that to which Loose is entitled, we shall affirm.

We, therefore, affirm all of the judgment except as to the Lederman-Zimmerman Co., and as to it we reverse and remand with directions to dismiss the action.

MR. JUSTICE MCWILLIAMS not participating.