**DIME BOX PETROLEUM CORPORATION, Plaintiff,**

v.

**The LOUISIANA LAND AND EXPLORATION COMPANY, Defendant.**

**Civ. A. No. 86–B–2435.**

United States District Court, D. Colorado.

July 6, 1989.

As Modified Aug. 8, 1989.

Clyde A. Muchmore, Crowe & Dunlevy, PC, Oklahoma City, Okl., Mark F. O'Shell, Miller & Weiss, PC, Denver, Colo., for plaintiff.

H.R. McCollister, H.R. McCollister, PC, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Plaintiff, Dime Box Petroleum Corporation (Dime Box), commenced this action alleging breach of contract by defendant, The Louisiana Land and Exploration Company (LLE), in connection with two separate oil and gas exploration projects known as the Ambrose Prospect (Ambrose) and the Cycle VI Prospect (Cycle VI). Plaintiff also asserts claims of fraud and breach of fiduciary duty in connection with defendant's supply and pricing of tubular goods used in well drilling. Defendant counterclaims for breach of contract alleging that plaintiff failed to pay its share of lease acquisition costs in Ambrose. Jurisdiction is based on 28 U.S.C. § 1332(a)(1). The parties stipulate that Colorado law applies in this diversity action. Trial to the Court began June 12, 1989 and concluded June 15, 1989.

Upon the following findings of fact and conclusions of law the Court determines that LLE's counterclaim for acreage acquisition costs exceeds Dime Box's claim for production revenues due on the Ambrose Prospect. The Court also determines that Dime Box has prevailed on its Cycle VI breach of contract claim, but has not prevailed on its breach of fiduciary duty and fraud claims.

I. Breach of Contract

A. Findings of Fact

1. Ambrose Prospect

Dime Box claims that LLE breached its contract by overcharging on acreage acquisition costs and wrongfully withholding revenues. LLE counterclaims that Dime Box breached the contract by underpaying the acreage acquisition costs. The pivotal fact issue in deciding whether a breach of contract has occurred, and if so, by whom, is the amount Dime Box agreed to commit to acreage acquisition in the Ambrose Prospect.

a. Acreage Acquisition

By letter dated May 31, 1983 (Exh. 2), LLE proposed a joint venture with Dime Box to purchase oil and gas leases (acreage acquisition) within an area of North Dakota known to the parties as the Ambrose Prospect. The terms of this proposal included the venture's commitment of $1,000,000, with which the venture would acquire 4,000 to 5,000 acres at a ceiling of $225 per acre and a ⅛th royalty. It also provided that LLE would consult each joint venturer if lease acquisition exceeded this amount.

On June 1, 1983, (Exh. 3) Dime Box agreed to enter into the Ambrose Prospect joint venture with a maximum commitment by Dime Box of $400,000 which represented a 40% interest in the joint venture. LLE was the designated operator of wells developed in the Ambrose Prospect pursuant to joint operating agreements (JOA) between the parties. Although Dime Box's share of the Ambrose Prospect was 40% in 1983, in 1984 and 1985, Dime Box's and LLE's shares of the Ambrose Prospect increased to 50% after other participants dropped out of the venture.

In a December 1983 meeting between the parties, Dime Box's representative, George Platt (Platt) was told by LLE's representative, David Padgett, that additional expenditures of $500,000 were planned for lease acquisition in 1984. Platt verbally approved this additional 1984 expenditure at the meeting. This contract was confirmed by a January 10, 1984 letter from Dime Box to LLE (Exh. P), and a January 19, 1984 letter from Dime Box to its drilling participants. (Exh. 5). The parties further agreed in a December, 1984 meeting to spend an additional $200,000 in 1985 for fill-in acreage. *See also* Exhs. 12AA and D–13. Consequently, based on Dime Box's 50% ownership share in the Ambrose Prospect, Dime Box committed an additional $250,000 in 1984 and an additional $100,000 in 1985 for acreage acquisition. Therefore, during the three years Dime Box and LLE participated in the Ambrose Prospect, Dime Box committed a total of $750,000 for acreage acquisition costs of which $722,214 was actually spent.

The parties stipulated that Dime Box acquired acreage totalling $200,808.07 in addition to the contested amounts. Also, pursuant to a request from Dime Box, in January, 1986 Dime Box and LLE entered into a "buy back" agreement in which LLE agreed to purchase a percentage of Dime Box's working interest in leases in designated areas for $113,801.84. (Exh. 39) Therefore, the amount Dime Box is obligated to pay on leases totals $809,220.23. ($722,214.00 + $200,808.07 − $113,801.84 = $809,220.23) Dime Box paid to LLE $535,891 for acreage acquisition. (Exh. 120) Accordingly, Dime Box owes LLE $273,329.23 for acreage acquisition costs. ($809,220.23 − $535,891.00 = $273,329.23)

b. Production Revenues

During the course of their relationship, LLE withheld $359,227 in production revenues payable to Dime Box. Later, LLE refunded $165,959 of these revenues leaving a balance due from LLE to Dime Box of $193,268. (Exh. 125 and 126)

When the amount due LLE from Dime Box on acreage acquisition costs ($273,-329.23) is offset against the amount LLE owes Dime Box for production revenues, Dime Box owes LLE $80,061.23 for acreage acquisition costs.

2. Cycle VI Prospect

In August 1984, Dime Box and LLE entered into another joint venture to purchase oil and gas leases (acreage acquisition) in an area of North Dakota known to the parties as the Cycle VI Prospect. Pursu-

ant to a written agreement, (Exh. 19) Dime Box agreed to commit $350,000 for acreage acquisition in Cycle VI. In a December 1984 meeting between the parties, it was discovered that Dime Box's share of leases already purchased totalled $700,000. After negotiations on these overcharges, the parties agreed to reduce Dime Box's interest in Cycle VI from an undivided 35% interest to an undivided 20% interest. To facilitate LLE's obtaining additional partners to buy the 15% interest in Cycle VI, Dime Box agreed to pay 35% of the billings of a portion of Cycle VI and LLE agreed to refund thereafter the overpayment by check. (Exh. 26 and 27) The overpayment amounts to $83,917.76. LLE never refunded this overpayment by check or credit and therefore Dime Box overpaid LLE on Cycle VI a total of $83,917.76.

When the amount that Dime Box owes LLE on Ambrose acreage acquisition costs ($80,061.23) and the amount LLE owes Dime Box on Cycle VI ($83,917.76) are offset, $3,856.53 is owed by LLE to Dime Box.

### B. Conclusions of Law

#### 1. Ambrose Prospect

■ The existence of a contract is a question of fact to be determined by consideration of all facts and circumstances. *L.U. Cattle Co. v. Wilson*, 714 P.2d 1344 (Colo.App.1986). An offer and an assent manifested by act or conduct constitute a contract. *Linder v. Midland Oil Refining Co.*, 96 Colo. 160, 40 P.2d 253 (1935). Here, the Court concludes that Dime Box agreed to pay $750,000 for joint venture acreage acquisition. ($400,000 in 1983, $250,000 in 1984, and $100,000 in 1985)

#### 2. Cycle VI Prospect

■ An operator has an interest in oil and gas revenues to the extent of any participants's unpaid share of the costs. *Reserve Oil, Inc. v. Dixon*, 711 F.2d 951 (10th Cir.1983).

■ Whether a contract has been modified is a question for the trier of fact. *Uinta Oil Refining Co. v. Ledford*, 125 Colo. 429, 244 P.2d 881 (1952). Modifica-

tion of an agreement requires mutual consent of the parties which can be either explicitly given or inferred from the parties' conduct. *Reynolds v. Farber*, 40 Colo. App. 467, 577 P.2d 318 (1978).

■ The parties agreed to reduce Dime Box's interest in Cycle VI from 35% to 20%. To facilitate LLE's obtaining additional partners to buy the 15% interest, the parties agreed that Dime Box would pay 35% of designated Cycle VI billings. LLE agreed to refund overpayment by check. The Court concludes that the parties thereby modified their existing contract. (Exh.25) LLE breached the modified contract by failing to refund Dime Box's overpayment.

### II. Breach of Fiduciary Duty—Tubular Pricing

Dime Box claims that LLE breached its fiduciary duty to Dime Box by entering into secret tubular goods purchase agreements for the benefit of LLE and to the detriment of Dime Box.

#### A. Duty

Dime Box contends that LLE's fiduciary duty arose from its designation as a co-venturer in a joint venture and under various JOAs with Dime Box in which LLE was operator and Dime Box was non-operator. However, the breaches of fiduciary duty alleged by Dime Box related only to the purchase and supply of tubulars (pipe and casing) pursuant to their JOAs rather than to their acreage acquisition joint ventures. Thus, the precise issue is whether a fiduciary relationship arises between an operator and non-operator pursuant to its JOA as a matter of fact, or by operation of law.

#### 1. Findings of Fact

The management of Dime Box and LLE are sophisticated and experienced oil and gas persons who were of equal bargaining power at all relevant times. The parties entered into JOAs for the purposes of drilling and developing wells on land acquired by their joint ventures in the Ambrose and Cycle VI prospects. Article VII of each JOA states in pertinent part:

## A. Liability of Parties

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners. (Emphasis in original)

The pertinent JOAs contained specific language stating the standard by which the operator's conduct was measured. Art. V.A. entitled "Designation and Responsibilities of Operator" states:

The Louisiana Land and Exploration Company shall be the Operator of the Contract Area.... It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

The JOAs also contained different deadlines for payment of expenses, contained modifications of, among others, the "Subsequently Created Interest" provision, the "Notices" provision, the "Advances and Payments by Non–Operators" provision of the Council of Petroleum Accountants Societies of North America (COPAS) Accounting Procedure Joint Operations attachment, and the "Pricing of Joint Account Material Purchases, Transfers and Dispositions" provision. Although the JOAs covering Ambrose and Cycle VI are printed contracts which contain numerous standard provisions, the JOAs were negotiated documents.

After entering into the JOAs in the Ambrose Prospect in June 1983, Dime Box began to receive charges for tubular goods which were being used in drilling operations. These billings showed that LLE was charging the participants Eastern Mill prices (§ IV.2 of the JOA) for tubular goods which did not include discounts then generally available. Dime Box questioned these prices. LLE responded to these inquiries in a letter dated July 26, 1983 (Exh.11) in which it stated that it would continue to bill at these prices pursuant to Section IV.2 of the JOA. LLE explained that it had a considerable amount of tubular inventory which would be used in future wells. LLE also said that it would continue to bill the participants at the published mill prices for items transferred from their inventory.

In response to this information, Dime Box requested that it receive the current discounts on tubulars or be allowed to supply their share of tubulars in kind for all the wells in the Ambrose Prospect in which they were participants. (Exh.11) LLE accepted the option that Dime Box would supply their share of tubulars in kind. Dime Box supplied tubulars in kind on all wells in which it participated in the Ambrose Prospect including three wells that had already been drilled when the "tubulars in kind" option was implemented.

### 2. Conclusions of Law

A fiduciary relationship exists between parties to a joint venture. *Lucas v. Abbott,* 198 Colo. 477, 601 P.2d 1376 (1979). Each joint venturer has a duty to make full disclosure to his colleagues on matters concerning the venture. *Id.* Whether a joint venture exists is a question of fact for the fact-finder to determine from the facts and circumstances in evidence. *Agland, Inc. v. Koch Truck Line, Inc.,* 757 P.2d 1138 (Colo.App.1988). A joint venture cannot arise by operation of law. *Fulenwider v. Writer Corp.,* 544 P.2d 408 (Colo.App. 1975).

Contracts must be read using the plain and generally accepted meaning of words. *Radiology Professional Corp. v. Trinidad Area Health Ass'n, Inc.,* 195 Colo. 253, 577 P.2d 748 (1978). As an equitable matter, "a trustee type relationship imposing a duty of fair dealing between the operator and the non-operator owners [may arise] in the matter of distribution of shares among owners." *Reserve Oil, Inc. v. Dixon,* 711 F.2d 951, 953 (10th Cir.1983).

A fiduciary relationship is created when such a trust is imposed on the operator. *In re Mahan & Rowsey, Inc.*, 817 F.2d 682 (10th Cir.1987). However, "an agency relationship may be "specifically disavowed in the contract itself." *Id.* And the relationship between parties to a joint operating agreement is "controlled by the terms of their agreements voluntarily made." *Frankfort Oil Company v. Snakard*, 279 F.2d 436 (10th Cir.1960), *cert. denied*, 364 U.S. 920, 81 S.Ct. 283, 5 L.Ed.2d 259 (1960). Dime Box's position as a corporation sophisticated in oil and gas matters militates against this Court finding that a fiduciary relationship was created by these JOAs when the JOAs specifically define the standard by which the operator's conduct is measured. Moreover, the Court concludes that where, as here, experienced and sophisticated parties with equal bargaining power have fully negotiated a contract which specifically disavows a joint undertaking, no joint venture was formed and, thus, no fiduciary relationship was created by the JOAs.

### B. Damages

Alternatively, assuming LLE owed Dime Box a fiduciary duty, the Court concludes that, as to the Ambrose Prospect, plaintiff failed to prove damages from a breach of any such duty. Dime Box supplied its pro rata share of tubulars in kind in the Ambrose Prospect. Consequently, it suffered no damage there from any conduct by LLE concerning tubular pricing. Therefore, as to the Ambrose Prospect, Dime Box cannot prevail in any event on its claim of breach of fiduciary duty.

### III. Breach of Fiduciary Duty—Tubular Excess

Dime Box also asserts that LLE breached its fiduciary duty by improperly declaring to be salvage excess tubular goods supplied in kind by Dime Box in various Ambrose Prospect wells.

Testimony at trial established that, pursuant to LLE's policy, the excess tubular goods were inspected by an inspection company to check the condition of the tubulars. LLE was told that the tubulars would have to be rethreaded to be useable. An LLE purchasing department employee declared the tubulars "surplus" based on his determination that the cost to rethread the tubulars would exceed the value of the tubulars. He then credited Dime Box for the tubulars at 3 cents per lb. Provision IV of COPAS, attached as Exhibit C to all JOAs in this case, provides that the operator may purchase, but is under no obligation to purchase the interest of non-operators in surplus material.

The Court finds and concludes that LLE properly declared the tubulars "surplus" and properly credited Dime Box's account for its value. LLE breached no duty, fiduciary or otherwise, in it's actions concerning excess tubulars in the Ambrose Prospect.

### IV. Fraud—Cycle VI Tubulars

Dime Box alleges that LLE defrauded it in connection with tubular goods by entering into secret tubular buy-back agreements with third parties to the detriment of Dime Box. Because Dime Box proved no damage regarding the Ambrose Prospect tubulars, *see* II.B, *supra*, the Court addresses Dime Box's fraud claim as to Cycle VI tubulars only.

### A. Findings of Fact

In June 1984, Dime Box expressed interest in entering into the Cycle VI lease acquisition and well drilling programs. During discussions with LLE, Dime Box was told that LLE was hesitant to let Dime Box participate in an area other than Ambrose because of the parties' previous problems with tubulars in the Ambrose Prospect. LLE refused to agree that Dime Box could supply tubulars in kind in Cycle VI.

In August 1983, LLE had entered into buy-back agreements with third parties under which LLE sold all of its current tubular goods inventory which had been purchased previously at a very high price during a period of high demand. Under these agreements, LLE agreed to later buy back two to three times the amount of tubular goods at the same above-market price, which price it charged to its drilling partici-

pants. Thus, as of August 1983, LLE no longer had any tubular goods inventory.

Despite having no tubular inventory, LLE charged Dime Box Eastern Mill Prices for tubulars based on COPAS Art. IV(2)(A)(1) which allows an operator to price tubulars transferred out of inventory at "Eastern Mill Price." Expert testimony established that tubulars obtained through suppliers pursuant to buy-back agreements should be treated as material purchases under Art. IV, 1 *supra* for which "the operator will make reasonable efforts to take advantage of all discounts available." (Exh.S–17).

Meanwhile, on May 15, 1984, the parties entered into a JOA for the drilling of the # 1 Thomte 44–8 well in a prospect other than Cycle VI. (Exh.43) Article XV.T of that JOA provides:

It is recognized that the Operator at the effective date of this Agreement does not currently maintain an inventory of tubular goods....

The Cycle VI JOA between the parties was implemented on August 29, 1984.

Dime Box had notice, as of May 15, 1984, that LLE had no tubular inventory. After May 15, 1984, any reliance on information from LLE that LLE had a tubular inventory, and thus, was entitled to charge Eastern Mill prices was unjustified in light of the May 15, 1984 JOA (Exh.43) and Dime Box's status as a petroleum exploration company run by sophisticated and experienced oil and gas people. And, Platt testified that the existence of such buy-back agreements was common knowledge in the "patch." (the oil and gas industry) Thus, although LLE continued to charge participants as if it had a tubular inventory, Dime Box knew or should have known that no such inventory existed.

### B. Conclusions of Law

In order to prevail on its claim of deceit based on fraud by misrepresentation or concealment, plaintiff must prove, *inter alia,* that plaintiff relied on the material false representation or took such action relying on the assumption that the concealed fact did not exist or was different from what it actually was and plaintiff's reliance was justified. *Trimble v. City & County of Denver,* 697 P.2d 716 (Colo. 1985); *Teodonno v. Bachman,* 158 Colo. 1, 404 P.2d 284 (1965) (concealment); *Morrison v. Goodspeed,* 100 Colo. 470, 68 P.2d 458 (1937).

One is not justified in relying on a representation which a person of the same or similar intelligence, education or experience would recognize as false. *Zimmerman v. Loose,* 162 Colo. 80, 425 P.2d 803 (1967). Also, one is not justified in relying on the assumption that another will not intentionally conceal a material fact if a person of the same or similar intelligence, education or experience would not rely on it. *Glisan v. Smolenske,* 153 Colo. 274, 387 P.2d 260 (1963) (no recovery where undisclosed material fact was patent). Notice to an agent of a corporation in discharge of official duties, of material facts, is the knowledge of the corporation. *Mayer Oil Co. v. Schnepf,* 100 Colo. 578, 69 P.2d 775 (1937); *Jones v. King Resources Co.,* 32 Colo.App. 56, 509 P.2d 814 (1973).

The Court concludes that Dime Box has failed to meet its burden of establishing that it relied on any representation, affirmative or by omission, by defendant and that reliance, if any, was justified.

### V. Audit Costs

Dime Box also seeks $36,000 representing the cost of a joint audit in connection with its tubular claims.

Pursuant to COPAS Art. I, ¶ 5, "the Operator shall bear no portion of the Non–Operators' audit cost ... unless agreed to by the Operator." No evidence was introduced which showed that LLE agreed to share audit costs. Therefore, LLE is not liable to Dime Box for any audit costs.

Accordingly, it is ORDERED that:

1. after offset of the above breach of contract claims, judgment in the amount of $3,856.53 with interest calculated from January 20, 1987, (Exh.26) shall enter on behalf of plaintiff;

2. plaintiff's claims of breach of fiduciary duty and fraud are DISMISSED with prejudice;

3. each party shall bear its own costs.