**T.A. PELSUE COMPANY, Plaintiff,**

v.

**GRAND ENTERPRISES, INC., Allan E. Beavers, and Robert A. Fulcher, Defendants.**

**Civ. A. No. 89–S–1645.**

United States District Court, D. Colorado.

Dec. 30, 1991.

Nunc Pro Tunc June 25, 1991.

Tom Young, Charles Goldberg, Rothgerber, Appel & Powers, Denver, Colo., for plaintiff.

George Matava, Craig Groseth, Sheridan Ross & McIntosh, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

SPARR, District Judge.

This is a suit for patent infringement pursuant to 35 U.S.C. § 1 *et seq.* and for related pendent claims. This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a) and (b), and pendent jurisdiction. This court has personal jurisdiction over the Defendants, all of whom are residents of Colorado. Venue is proper pursuant to 28 U.S.C. §§ 1391 and 1400(b), in that all the Defendants reside in this judicial district. *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574 (Fed.Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991). This case came before the court for trial commencing on June 10, 1991. Having considered the evidence and argument by counsel, the court now makes the following Findings of Fact, Conclusions of Law, and Order.

## I. PARTIES AND CLAIMS

On October 4, 1990, the court entered a Stipulated Consent Judgment and Dismissal With Prejudice of the claims against Defendants Robert Miller, Arthur Utech, and Mountain Utility Sales, Inc. (Mtn. Utility) (Exhibit 235). Defendants Beavers, Fulcher and Grand Enterprises, Inc. (Grand) are the only Defendants remaining in the case. Pelsue Co.'s Third Claim for Relief against Defendant Aguilar was resolved by a stipulated consent judgment approved by the court on September 20, 1990. (Exhibit 236). Judgment was previously entered in favor of Pelsue Co. and against Defendant Grand on the Fourth Claim for Relief pursuant to a confession of judgment at the preliminary injunction hearing on November 16, 1990. The Fourth Claim for Relief remains before the court for a determination of damages only. Pelsue Co.'s Fifth and Sixth Claims for Relief were dismissed by the court at the close of the Plaintiff's evidence pursuant to Fed.R.Civ.P. Rule 41(b). Pelsue Co.'s Eighth, Tenth, and Twelfth Claims for Relief were dismissed by the court at the close of all the evidence pursuant to Rule 41(b). Beavers has abandoned his Second Counterclaim for breach of contract.

Presently before the court are: (1) Plaintiff's First Claim for Relief for patent infringement against Defendant Grand; (2) Plaintiff's Second Claim for Relief for patent infringement against Defendants Beavers and Fulcher; (3) Plaintiff's Seventh Claim for Relief alleging breach of fiduciary duty and the duty of loyalty against Defendant Beavers; (4) Plaintiff's Ninth Claim for Relief alleging civil conspiracy against all three Defendants; (5) Plaintiff's

Eleventh Claim for Relief alleging false representation and non-disclosure against all three Defendants; (6) Plaintiff's Motion for Fees Incurred in Connection with the Counterclaim of Grand Enterprises, Inc. for Tortious Interference with Existing and Prospective Contractual Relations; and (7) Defendant Beavers's First Counterclaim for breach of contract.

Pelsue Co. seeks injunctive relief, compensatory damages, enhanced damages pursuant to 35 U.S.C. § 284 for willful infringement, and attorneys' fees pursuant to 35 U.S.C. § 285, among other relief. Defendants generally deny the allegations. Defendant Beavers seeks compensation for breach of contract for Pelsue Co.'s failure to pay $35,000.00 due and owing under a letter agreement.

## II. FINDINGS OF FACT

Plaintiff Pelsue Co. is a privately-held Colorado corporation with its principal place of business in Englewood, Colorado. Since 1962, Pelsue Co. has been in the business of manufacturing and selling products designed for use in construction and maintenance of utility company outside plant facilities. These products include tents, blowers, heaters, hoses, manhole shields and guards, and other portable equipment used in the outside plant industry.

Defendant Beavers is a former employee of Pelsue Co. who presently resides in Grand Junction, Colorado. Defendant Fulcher has been married to Beavers's daughter, Diana Fulcher, since 1967 and also resides in Grand Junction. Defendant Grand is a Colorado corporation incorporated by Beavers and Fulcher on February 2, 1987 with its principal place of business in Grand Junction, Colorado. Grand also manufactures portable products and tents for the utility industry. Since Grand's incorporation, Beavers has been, at various times, Grand's president, a director, a shareholder, a consultant, and a source of substantial financial backing. Fulcher has been an officer, director, and substantial shareholder. Grand is presently owned by Fulcher and his wife, Diana.

Defendant Beavers was employed by Pelsue Co. from 1965 until January of 1987, at which time he retired. Beavers was responsible for engineering, design, and manufacturing at Pelsue Co. He was promoted to the position of Executive Vice President and was on the board of directors of Pelsue Co. from 1972 until approximately mid-autumn of 1988. Beavers patented several inventions while working for Pelsue Co., including the tent which is the subject of United States Patent No. 3,810,482 (the 482 patent) and the "tent hub" which is the subject of United States Patent No. 4,637,-748 (the 748 patent). The 482 patent and the 748 patent were assigned by Beavers to Pelsue Co. (Exhibits 33 and 156).

On December 15, 1967, Beavers entered into an agreement (Exhibit A) with Al Pelsue, the founder of Pelsue Co. and the father of Brad Pelsue. Exhibit A provided that Beavers was to receive a monthly salary from Pelsue Co. and an annual bonus based on a percentage of income as shown on Pelsue Co.'s income tax returns. In the event the company were sold, merged, or liquidated while the agreement was in effect or within one year after termination of Beavers's employment, Beavers was to receive five percent (5%) of the net gain realized from the sale, merger, or liquidation. (*See* Exhibit A). Beavers was employed at Pelsue Co. pursuant to the terms of this agreement until approximately mid-November of 1986.

Beavers announced his decision to retire at a meeting of the Board of Directors on March 20, 1986. The Board was concerned about losing Beavers and his design and engineering skills. In November of 1986, Beavers and Pelsue Co. entered into a new agreement. (Exhibit B). Exhibit B was negotiated in response to the Board's concerns and retained Beavers as a consultant to Pelsue Co. from February of 1987 to February of 1991. Exhibit B superseded all previous agreements between Beavers and Pelsue Co., including the agreement reflected in Exhibit A. Exhibit B provided that Beavers was to receive his full salary as an employee through January of 1987 and, beginning in February of 1987, Bea-

vers was to be paid $3,000.00 per month for a period of four (4) years, until February 1, 1991). Beavers was to remain on Pelsue Co.'s group insurance policy, the cost of which would be deducted from his monthly pay. Beavers was to continue to serve on the Board of Directors and was to be compensated separately for that service. Beavers could continue to provide specialized services for Pelsue Co. on a fee basis even beyond February of 1991.

After leaving Pelsue Co. and moving to Grand Junction, Beavers joined Fulcher in establishing Grand Enterprises, Inc. Grand was incorporated by Beavers and Fulcher on February 2, 1987. At the time of incorporation, Beavers and Fulcher were equal owners of the common stock in Grand. Beavers was the president, Fulcher the vice president, and both were directors of the corporation.

During 1987, Grand made products for the nursery business and Beavers worked part-time on other research. But, by December 7, 1987, Grand did not have enough money to continue in business. (Exhibit 168). Fulcher and his wife, Diana Fulcher, decided that Grand should begin making products for the utility industry. This would put Grand in direct competition with Pelsue Co. Fulcher explained this decision to Beavers on or about Christmas of 1987. Beavers initially disputed the decision, recognizing that he could not compete directly with Pelsue Co. while Pelsue Co. was paying him a salary and while he continued to serve as a director of Pelsue Co.

To avoid impropriety, Beavers attempted to distance himself from Grand by selling his Grand stock to his daughter, Diana Fulcher, in exchange for a note. (Exhibit I–2). Beavers resigned as president and as a director of Grand. (Exhibit 167). However, Beavers continued to use the facilities at Grand, maintained an office at Grand, corresponded on Grand stationery, and provided Grand with substantial capital. Although he argues that he was divested of any interest in Grand, Beavers ultimately contributed approximately $180,000 to Grand. (Exhibit 23).

Beavers also continued to work on research and development of Grand products after Christmas of 1987. In fact, as early as June of 1987, Beavers was designing products that directly competed with Pelsue Co. products. He worked on a bottle warmer, a heater blower, a hose canister, a jig for a manhole guard, and other pieces of equipment. (Exhibits 176, 177). Although Beavers claims he was designing these products for Pelsue Co., the evidence indicates otherwise.

In January of 1988, Beavers, Fulcher, and Grand learned that Art Utech and Bob Miller had formed Mtn. Utility. Mtn. Utility had a distributors' agreement with Pelsue Co. to sell Pelsue Co. products. (Exhibit 100). Grand discussed with Utech and Miller the possibility of selling Grand products through Mtn. Utility in direct competition with Pelsue Co. The purpose of these discussions was to build a market for Grand products in the utility industry. Fulcher admitted at trial that he talked to Miller and Utech for this reason in mid–1988.

Beavers continued to attend formal meetings of the Pelsue Co. Board of Directors. At those meetings, many aspects of Pelsue Co. were discussed. Despite his continuing activities and compensation as an employee and a director of Pelsue Co., Beavers never disclosed to anyone at Pelsue Co. his activities with Grand, his financial support of Grand, or Grand's intent to compete with Pelsue Co. products. Although Beavers and Fulcher denied throughout 1988 that they were engaged in any competition with Pelsue Co., the evidence shows that Beavers and Fulcher were attempting to directly compete with Pelsue Co. in the utility market and to obtain as much of Pelsue Co.'s share of that market as possible. Neither Beavers nor Fulcher ever disclosed their intent to compete to anyone associated with Pelsue Co. In fact, they continued to assure Pelsue Co. that Grand was not competing with Pelsue Co. products.

In July of 1988, Brad Pelsue received information that Beavers and Grand were competing with Pelsue Co. Pelsue Co. then suspended the payments that were

being made for Beavers's services as an employee and a director of Pelsue Co. pursuant to Exhibit B. Brad Pelsue sent Beavers a letter requesting his resignation from the Board because of his conflict of interest. (Exhibit 6). Beavers responded, stating:

> "I am not in competition with Pelsue. I am developing new products that are needed in industry and construction and some automotive...."

(Exhibit 18). Pelsue Co. responded on July 12, 1988:

> "You state that you are not in competition with T.A. Pelsue Company, yet I have your price list showing a 'Grand–Can' Model 3000. Indeed, you have elected to use the same model numbers as the Pelsue products. That is competition whether you ever take an order or not."

(Exhibit 4).

Following this exchange, Beavers attempted to resolve the conflict by telephoning Brad Pelsue's mother, Pat Pelsue. On July 28, 1988, Beavers confirmed his conversation with Pat Pelsue in a letter to Brad Pelsue, suggesting a meeting to resolve their differences and indicating he would await Pelsue Co.'s response. (Exhibit 19).

On August 2, 1988, Fulcher also wrote to Brad and Pat Pelsue, denying that Grand intended to compete with Pelsue Co.:

> "I discussed with you Grand will endeavor to build new and different products to enhance the Pelsue line, rather than to compete with it.... As you are aware Grand Enterprises Inc. is currently building a few 'Grand Cans' & 'Grand–Gards', minor products, but are necessary for Grand to have in it's (sic) line to go with it's (sic) current and future products, which the Pelsue Co. does not have in it's (sic) line of products for sale."

(Exhibit 106).

Beavers and Brad Pelsue met in August of 1988 in Vail, Colorado. They conversed several times by telephone prior to the meeting. In those conversations and at the Vail meeting, Beavers continued to assure Brad Pelsue that Grand was not competing with Pelsue Co. At the Vail meeting, Beavers admitted that he was involved in Grand as president, investor, and inventor, but he assured Brad Pelsue that Grand did not intend to compete with Pelsue Co. Brad Pelsue asked Beavers to sign a noncompete agreement, but Beavers refused, indicating that there was no need for a noncompete agreement since he had no intention of competing with Pelsue Co.

The evidence shows that Beavers and Fulcher attempted to convince Brad Pelsue that Grand was not in competition with Pelsue Co. in order to obtain reinstatement of the $3,000.00 per month payments to Beavers under Exhibit B. Based upon the repeated oral and written assurances of both Beavers and Fulcher that Grand was not competing with Pelsue Co., Brad Pelsue reinstated the $3,000.00 per month payments to Beavers pursuant to Exhibit B. This money ultimately financed the operation of Grand.

By November of 1988, Grand was planning to build tents in competition with Pelsue Co.'s tents. In November of 1988, Beavers and Fulcher contacted Neal Weckworth about manufacturing the fabric "skins" for Grand tents. (Exhibits 12 and 13). Grand had already developed a tent and a sample was sent to Weckworth shortly after Thanksgiving of 1988. (Exhibit 13).

On December 8, 1988, Beavers contacted Brad Pelsue to request a "discounted lump sum settlement" of some joint investments. (Exhibit S). Beavers also sought acceleration of the remaining payments due him under Exhibit B. On March 3, 1989, Beavers and Pelsue met and entered into an agreement whereby Beavers was to receive $95,000 in three unequal payments in exchange for: (1) a release of "deferred compensation" from Pelsue Co. and (2) release of a mortgage held by Beavers on stock in Langdon Manufacturing Company. (Exhibit X). Beavers was paid $25,000.00 on March 3, 1989, received a second payment of $35,000.00 on April 3, 1989, and was due to receive a final payment of $35,000.00 on May 3, 1989.

By accepting the settlement reflected in Exhibit X, Beavers suffered a substantial loss of his investments. He admitted at trial that he entered into the Exhibit X agreement to get his money out before Pelsue Co. discovered that Grand was competing with Pelsue Co. At the meeting on March 3, 1989, Beavers again represented that he was not competing with Pelsue Co. However, Pelsue Co. soon discovered the extent of Grand's competition with Pelsue Co., and refused to pay the last $35,000.00 payment due May 3, 1989. That withholding of the final payment is the subject of the single remaining counterclaim for breach of contract.

After entering into the Exhibit X agreement in March of 1989, Beavers continued his services as an officer of Grand. On April 13, 1989, he signed Grand's corporate report in his capacity as president and director. (Exhibit 38). On April 26, 1989, he signed a Uniform Commercial Code statement as president of Grand. (Exhibit 21).

Pelsue Co. learned of Grand's allegedly infringing tent just prior to May of 1989. Pelsue Co. also learned that Mtn. Utility was selling Grand's products in direct competition with Pelsue Co. and promoting Grand's products over Pelsue Co.'s products. Pelsue Co. refused to make the final payment to Beavers under the Exhibit X agreement, terminated Pelsue Co.'s distributors' agreement with Mtn. Utility, and ultimately filed this lawsuit.

## III. CONCLUSIONS OF LAW

### A. Pendent State Law Claims

1. Seventh Claim for Relief for Breach of Fiduciary Duty and Duty of Loyalty against Beavers

■ A corporate director is in a fiduciary relationship with the corporation. *See United States v. Gates*, 376 F.2d 65, 77 (10th Cir.1967); *Unicure, Inc. v. Thurman*, 42 Colo.App. 241, 599 P.2d 925, 927 (1979); *Security National Bank v. Peters, Writer and Christensen, Inc.*, 39 Colo.App. 344, 569 P.2d 875, 880 (1977); *Hudson v. American Founders Life Ins. Co.*, 151 Colo. 54, 377 P.2d 391, 393 (1962); *Kullgren v. Navy Gas & Supply Co.*, 110 Colo. 454, 461–62,

135 P.2d 1007, 1010 (1943). Among a director's fiduciary duties is the duty to not engage in enterprises directly in competition with and necessarily having an injurious or detrimental effect upon the corporation's business. *Williams v. Stirling*, 40 Colo.App. 463, 583 P.2d 290, 292 (1978).

■ Similarly, a high-ranking employee of a corporation, whether a director or not, owes a duty of loyalty to the corporation. *Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486, 492–94 (Colo.1989). This duty of loyalty includes the duty to not solicit customers for a rival business before the end of his or her employment and the duty to not solicit co-employees to join a new competing enterprise. *Jet Courier*, 771 P.2d at 493–94. Fairness dictates that an employee not be permitted to exploit the trust of his employer so as to obtain an unfair advantage in competing with the employer in a matter concerning the latter's business. *Jet Courier*, 771 P.2d at 492, *quoting Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 382 A.2d 564, 568 (1978).

■ Directors and employees are not precluded from engaging in a business similar to their corporation's business, so long as they act in good faith toward the corporation. *Jet Courier*, 771 P.2d at 493–94. Directors and employees are allowed to prepare or make arrangements to compete with their corporation prior to leaving employment so long as those preparations do not amount to a violation of their duty of loyalty. *Jet Courier*, 771 P.2d at 493–94. While an employee may have a privilege to prepare or make arrangements to compete with the employer prior to leaving that employment, the nature of those preparations is significant in determining whether the employee may have breached his or her duty of loyalty to the employer. *Koontz v. Rosener*, 787 P.2d 192, 195 (Colo.App.1989).

■ Resignation or termination does not automatically free a director or employee from his or her fiduciary obligations. A former director breaches his or her fiduciary duty if he or she engages in transactions that had their inception before the

termination of the fiduciary relationship or that were based on information obtained during that relationship. *Comedy Cottage, Inc. v. Berk,* 145 Ill.App.3d 355, 99 Ill.Dec. 271, 276, 495 N.E.2d 1006, 1011 (Ill.App. 1986). Once the fiduciary relationship is terminated, employees may compete with their employers as long as prior fiduciary confidences are not used to the corporation's detriment. 3 Fletcher Cyc. Corp. § 860.

■ Throughout the trial, Beavers contended that he was not an employee of Pelsue Co. after his retirement, but was being paid some type of "deferred compensation." Therefore, Beavers argues, he owed no fiduciary duty or duty of loyalty to Pelsue Co. pursuant to the Exhibit B letter agreement. The court disagrees. Exhibit B does not mention deferred compensation, but does provide Beavers with continued group insurance coverage. The evidence indicates that Beavers intended to preserve his profit sharing contribution, health insurance benefits, and social security benefits by remaining an employee until age 65. The parties to Exhibit B intended that Beavers would be an employee, consultant, and director following his retirement on February 1, 1987 until February 1, 1991. The court concludes that Exhibit B was a contract with a term from February 1, 1987 until February 1, 1991. As a result of this agreement, Beavers had a duty of loyalty as an employee and a fiduciary duty as a director through the term of the agreement.

In addition, on January 14, 1987, Beavers wrote to Pelsue Co., confirming his status as a "part-time employee". In that letter he stated:

"Effective February 1, 1987, I will become a part-time employee for the T.A. Pelsue Company.

"In conjunction with this change in status, I request that I not be included in employee insurance coverage in the areas of health, life, dental and long-term disability."

(Exhibit 93). Also, in a letter dated December 8, 1988, Beavers addressed Brad Pelsue as follows:

"Pursuant to our discussion about a discounted lump sum settlement of our agreements on four items: 1989 & 1990 PELSUE EMPLOYMENT $72,000,...."

(Exhibit S). The court concludes that Beavers continued to be an employee of Pelsue Co. even after his retirement in November of 1986.

Next, Beavers argues that he was discharged from any fiduciary duty or duty of loyalty owed to Pelsue Co. when he was terminated as a Pelsue Co. employee. The Board voted to remove Beavers from the Board on August 2, 1988. (See Exhibit O). However, resignation or termination does not automatically free a director or employee from his or her fiduciary obligations. *Comedy Cottage,* 99 Ill.Dec. at 276, 495 N.E.2d at 1011. In Exhibit O, Pat Pelsue indicated that the dismissal of Beavers from the Board in no way affected his contractual relationship with Pelsue Co. The court concludes that Beavers was not discharged from his fiduciary duty or duty of loyalty to Pelsue Co.

Finally, Beavers argues that his fiduciary duties ended upon his removal from the Board on August 2, 1988, or at least upon Pelsue Co.'s refusal to make the May 3, 1989 payment pursuant to Exhibit X. The court does not agree. The evidence established that Pelsue Co.'s damages did not end in 1988 or in 1989, as the Defendants argue. The law provides that Beavers's fiduciary duties were not automatically discharged upon his termination as a director or employee, *Comedy Cottage,* 99 Ill.Dec. at 276, 495 N.E.2d at 1011, and that adequate compensation for Pelsue Co.'s damages includes economic losses caused by the breach of fiduciary duty which will probably be incurred in the future. CJI–Civ. 26:4 (1990).

■ Beavers violated his fiduciary duty and duty of loyalty while he was a director and employee and after he ceased to be a director and employee of Pelsue Co. While he was an employee and director pursuant to Exhibit B, Beavers was actively engaged designing, manufacturing, and selling products for Grand that competed with Pelsue Co.'s products. Beavers, Fulcher, and

Grand solicited Pelsue Co.'s customers, Pelsue Co.'s employees, and Pelsue Co.'s distributors for Grand. Beavers used information that he had acquired during his many years with Pelsue Co. to develop and promote Grand. The evidence demonstrates that the success of Grand was made possible because Beavers used information and resources available to him by virtue of his long-term fiduciary relationship with Pelsue Co.

■ Actual damages provide adequate compensation for damages proximately resulting from a breach of fiduciary duty. CJI–Civ.3d 26:4 (1990). As a result of Beavers's breach of his fiduciary duty and his duty of loyalty, Pelsue Co. is entitled to recover: (1) any noneconomic losses or injuries incurred to the present time or which will probably be incurred in the future; and (2) any economic losses incurred to the present time or which will probably be incurred in the future, including any profit that Beavers received as a result of the breach of fiduciary duty, any loss of Pelsue Co.'s principal assets caused by the breach of fiduciary duty, and any lost profits which Pelsue Co. could reasonably have expected to earn had the fiduciary duty not been breached. *Koontz*, 787 P.2d at 198; CJI–Civ.3d 26:4 (1990).

■ Beavers is not entitled to any compensation for services performed during the period in which he engaged in activities constituting a breach of his fiduciary duty and his duty of loyalty to Pelsue Co. *Wilshire Oil Co. v. Riffe*, 406 F.2d 1061, 1061–62 (10th Cir.1969), *cert. denied*, 396 U.S. 843, 90 S.Ct. 105, 24 L.Ed.2d 92 (1969); *Koontz*, 787 P.2d at 197; *Jet Courier*, 771 P.2d at 500. Accordingly, Beavers must disgorge all compensation he received from Pelsue Co. for his services as an employee and a director pursuant to Exhibit B. The court concludes that Beavers is not entitled to the compensation he received from Pelsue Co. between February 1, 1987 (the date that payments began pursuant to Exhibit B) and March 3, 1989 (the date that Beavers and Pelsue Co. entered into Exhibit X). The parties stipulated at trial to the amount Beavers was paid pursuant to Exhibit B from February 1, 1987 to March 3, 1989, which totalled $76,855.00. Beavers must disgorge the $76,855.00 in payments plus interest compounded monthly beginning February 1, 1987, the date that payments began pursuant to Exhibit B, through June 25, 1991, the date the trial ended.

Pelsue Co. is also entitled to lost profits which it could reasonably have expected to earn had the fiduciary duty not been breached. *Koontz*, 787 P.2d at 198; CJI–Civ.3d 26:4 (1990). The success of Grand was due primarily to Beavers's breach of his fiduciary duty and his duty of loyalty. The evidence indicated that Pelsue Co. had a significant portion of the market for both tents and other portable products in the United States. In addition to the losses on its tents (*see* patent infringement claims), Pelsue Co. is entitled to compensation for losses suffered because Grand sold products other than tents that competed with existing products or products under development by Pelsue Co. Prior to Grand's competition, Pelsue Co. was generally able to pass on reasonable cost increases in its prices. The testimony indicated that Grand introduced its products at prices substantially lower than Pelsue Co.'s prices. As a result, Pelsue Co. was required to maintain or reduce prices in order to compete with Grand. Pelsue Co. was damaged in that it incurred lost sales on Grand sales and significantly reduced margins on its own reduced sales due to Grand's competition. The introduction, manufacture, and sale of Grand's portable products other than tents resulted in lost profits to Pelsue Co. Those lost profits would include Pelsue Co.'s lost profits on Grand's sales and Pelsue Co.'s reduced profits on its own reduced sales, all as a result of the breach of fiduciary duty and the duty of loyalty.

Plaintiff's damages expert, Norris Weese, calculated Pelsue Co.'s lost profits up to February 1, 1991, the date that the Exhibit B agreement would have terminated. According to Weese's testimony and reports, Pelsue Co.'s lost profits on Grand's sales of products other than tents was $248,425.00 plus $35,356.00 interest as of

June 25, 1991, the date the trial ended. (Exhibit 350). The court concludes that Pelsue Co. is entitled to that amount for its lost profits on Grand's sales of products other than tents.

Pelsue Co.'s reduced profit on its own sales of products other than tents was $211,790.00 plus $26,704.00 interest as of June 25, 1991. (Exhibit 350). The court concludes that Pelsue Co. is entitled to that amount for its reduced profits on its own sales, less sixty percent (60%) because the evidence indicated that Pelsue Co.'s market share in these products was forty percent (40%) of the total market. Therefore, Pelsue Co.'s lost profits due to Beavers's breach of fiduciary and the duty of loyalty was $379,178.60 as of June 25, 1991. The court awards damages in this amount against Beavers individually on the Seventh Claim for Relief for breach of fiduciary and the duty of loyalty. As later explained in this Memorandum Opinion and Order, Beavers, Fulcher, and Grand Enterprises, Inc. shall be jointly and severally liable to Pelsue Co. for this amount.

With regard to Pelsue Co.'s request for damages for continuing losses, the court concludes that the proof of continuing losses is insufficient. The evidence indicated that after the November 19, 1990 preliminary injunction, Pelsue Co. immediately recovered its market position. The damages awarded through the date of expiration of Exhibit B adequately compensate Pelsue Co. for its losses attributable to the breach of fiduciary duty and the duty of loyalty. The court declines to award damages for continuing losses.

2. Eleventh Claim for Relief for False Representation and Non–Disclosure against Beavers, Fulcher, and Grand Enterprises, Inc.

■ Pelsue Co. alleges that the Defendants falsely represented that they were not competing with Pelsue Co. or, in the alternative, concealed or failed to disclose that they were competing with Pelsue Co. A false representation is any oral or written words, conduct, or combination of words and conduct that creates an untrue or misleading impression in the mind of another. CJI–Civ.3d 19:3 (1990). In order for Pelsue Co. to recover from the Defendants on the theory of deceit by false representation, Pelsue Co. must prove that: (1) the Defendants made a false representation of a past or present fact; (2) the fact was material; (3) the Defendants made the representation knowing it to be false; (4) the Defendants made the representation with the intent that Pelsue Co. act in reliance on the representation; (5) Pelsue Co. relied on the representation; (6) Pelsue Co.'s reliance was justified; and (7) this reliance caused damage to Pelsue Co. CJI–Civ.3d 19:1 (1990); *Concord Realty v. Continental Funding*, 776 P.2d 1114, 1117–18 (Colo.1989); *Kinsey v. Preeson*, 746 P.2d 542, 550 (Colo.1987); *Morrison v. Goodspeed*, 100 Colo. 470, 477–78, 68 P.2d 458, 462 (1937); *Forsyth v. Associated Grocers of Colorado*, 724 P.2d 1360, 1363 (Colo. App.1986).

■ The measure of damages in an action for false representation is actual damages, insofar as they have been proved by a preponderance of the evidence. CJI–Civ.3d 19:17 (1990). Actual damages are a necessary element of Pelsue Co.'s cause of action in deceit. *Sposato v. Heggs*, 123 Colo. 553, 561, 233 P.2d 385, 388 (1951). Actual damages may consist of: (1) the difference between the market value of the property and what its value would have been had the representation been true; and (2) any other consequential damages sustained as a proximate result of the false representation, concealment, or nondisclosure. CJI–Civ.3d 19:17 (1990); *Teare v. Sussman*, 120 Colo. 488, 492, 210 P.2d 446, 448 (1949); *Intermountain Lumber Co. v. Radetsky*, 75 Colo. 570, 573, 227 P. 564, 565 (1924); *Russell v. First American Mortgage Co.*, 39 Colo.App. 360, 565 P.2d 972, 974–75 (1977); *McNeill v. Allen*, 35 Colo. App. 317, 534 P.2d 813, 818–19 (1975). The measure of damages in an action based on false representations is the actual loss suffered, or the difference in value of what the plaintiff was induced to part with and the value of what the plaintiff received in the transaction. *Zimmerman v. Loose*, 162 Colo. 80, 91, 425 P.2d 803, 808 (1967);

*North American Sav. & Loan Ass'n. v. Phillips*, 94 Colo. 554, 557, 31 P.2d 492, 493 (1934).

■■■ The court concludes that the statements made by the Defendants in 1988 regarding Grand's competition with Pelsue Co. were knowing, false, material representations that induced Pelsue Co. to justifiably rely on those false representations and caused damages to Pelsue Co. The evidence demonstrates that by January of 1988 the Defendants had decided to actively compete with Pelsue Co. products. At that time, Beavers attempted to shed some appearances of impropriety. But he proceeded to research, design, manufacture, and sell Grand products in direct competition with Pelsue Co. while he continued to serve as a director and employee of Pelsue Co. under the terms of Exhibit B. On numerous occasions throughout 1988 and into 1989, the Defendants stated to Brad Pelsue and Pelsue Co. that Grand was not competing with Pelsue Co. products. (Exhibits 18, 106). Beavers made this same assurance to Brad Pelsue at the Vail meeting on or about August of 1988 and again on March 3, 1989. The Defendants knew these representations were false. Grand was already in the process of competing when the Defendants made the representations. The Defendants made these false representations with the intent that Pelsue Co. would continue payments to Beavers pursuant to Exhibit B and reinstate the suspended payments. Brad Pelsue and Pelsue Co. were ignorant of Grand's true activities and were deceived by these false representations. In reliance on the Defendants' false representations about the work Beavers was doing for Grand and about Grand's activities, Pelsue Co. continued paying Beavers under Exhibit B and resumed the suspended payments. The Defendants are therefore liable to Pelsue Co. for actual damages.

Pelsue Co. argues that the actual damages incurred from the Defendants' false representations include both the amounts paid to Beavers pursuant to Exhibit B and the amounts paid to Beavers pursuant to Exhibit X. The evidence indicates that the Defendants' competitive activities started immediately after Christmas of 1987. With regard to Pelsue Co.'s claim for damages pursuant to Exhibit B, the court concludes that Beavers was not entitled to payments for his services as employee and director of Pelsue Co. after January 1, 1988. The amount of compensation paid to Beavers pursuant to Exhibit B from January 1, 1988 to March 3, 1989 (the date that Beavers and Pelsue Co. entered into Exhibit X) included $3,000/month for his services as an employee and $4,350.00 (by stipulation at trial) for his services as a director. The court determines that the measure of damages to Pelsue Co. for the Defendants' false representations with regard to Grand's competition with Pelsue Co. is the $40,650.00 paid to Beavers pursuant to Exhibit B between January 1, 1988 and March 3, 1989. This amount has already been awarded to Pelsue under its Seventh Claim for Relief, wherein the court awarded Pelsue Co. the amount Beavers was paid pursuant to Exhibit B between February 1, 1987 and March 3, 1989.

With regard to Pelsue Co.'s claim for damages pursuant to Exhibit X, the court concludes that Beavers was entitled to full payment under Exhibit X. The $95,000 payment promised to Beavers pursuant to Exhibit X was a comprehensive, discounted, lump sum settlement between Pelsue Co. and Beavers for several matters. (Exhibit 110). The evidence indicated that part of the Exhibit X payment was a settlement for the balance of compensation due Beavers pursuant to Exhibit B from March 3, 1989 to February 1, 1991 and part of the payment was a settlement for release of a mortgage held by Beavers on stock in Langdon Manufacturing Company, a joint investment of Beavers and Brad Pelsue. (See Exhibit 99). Beavers accepted $95,000 to settle matters that may have been worth as much as $270,000. (See Exhibits 110, 112, 114, and X).

Pelsue Co. admits that it did not pay Beavers the final $35,000 payment, but argues that it justifiably breached the Exhibit X contract because Beavers was competing with Pelsue Co. Exhibit X contains no noncompete provisions. Although the obli-

gation to pay Beavers under Exhibit B was excused by Beavers's competition with Pelsue Co., Pelsue Co. has not proved what proportion of Exhibit X was for compensation due Beavers under Exhibit B. Accordingly, the full amount under Exhibit X is due and owing to Beavers without regard to the activities in which Beavers was engaged. The court concludes that Beavers is entitled to the full $95,000.00 amount contracted for in Exhibit X. Pelsue Co. has paid Beavers the first two installments pursuant to the terms of Exhibit X. Beavers is therefore entitled to the one remaining $35,000.00 payment plus interest dating from May 3, 1989, the date that the final payment was due.

 3. Fourth Claim for Relief for Interference with Contract against Grand Enterprises, Inc.

Judgment was entered on November 16, 1990 in favor of Pelsue Co. and against Grand Enterprises, Inc. on the Fourth Claim for Relief because Grand confessed the claim that it interfered with Aguilar's contract with Pelsue Co. by hiring him despite his noncompete agreement with Pelsue Co. Pelsue Co. seeks damages for the loss of valuable trade secrets, confidential information, customers, business, reputation, and goodwill. However, Pelsue Co. has not proved any such damages or that any such damages are attributable to Grand's interference with the contract between Pelsue Co. and Aguilar. Therefore, the court declines to award damages under the Fourth Claim for Relief.

 4. Ninth Claim for Relief for Civil Conspiracy against Beavers, Fulcher, and Grand Enterprises, Inc.

■ Five elements are required to establish a civil conspiracy under Colorado law: (1) two or more persons, and for this purpose a corporation is a person, (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof. *Hawkinson v. A.H. Robins Co., Inc.*, 595 F.Supp. 1290, 1314 (D.Colo.1984); *Jet Courier*, 771 P.2d at 502. Liability for civil conspiracy is joint and several. *Julius Hy-*

*man & Co. v. Velsicol Corp.*, 123 Colo. 563, 618, 233 P.2d 977, 1005–06 (1951), *cert. denied*, 342 U.S. 870, 72 S.Ct. 113, 96 L.Ed. 654 (1951), *reh. denied*, 342 U.S. 895, 72 S.Ct. 199, 96 L.Ed. 671 (1951); *Morrison*, 100 Colo. at 483, 68 P.2d at 464; Colo.Rev. Stat. § 13–21–111.5(4) (1987 Repl.Vol.). The essence of a civil conspiracy claim is not the conspiracy itself, but the actual damages resulting from acts done in furtherance of the conspiracy. *Jet Courier*, 771 P.2d at 502; *Morrison*, 100 Colo. at 483, 68 P.2d at 464. Actual damages must be proved, not speculative. *See Shows v. Silver Shield Mining & Milling Co.*, 150 Colo. 592, 597–98, 375 P.2d 522, 524–25 (1962); *Zimmerman v. Hinderlider*, 112 Colo. 277, 279, 148 P.2d 813, 814 (1944).

■ Pelsue Co. alleges in its Second Amended Complaint that all of the Defendants "conspired to deprive PELSUE of its rights and to interfere with its business to the detriment of PELSUE and to the individual and collective advantage of Defendants." Because Pelsue Co. has not prevailed on each and every claim in its Second Amended Complaint, the court considers this civil conspiracy claim only in the context of the First, Fourth, Seventh, and Eleventh Claims for Relief. As further explained in the findings and conclusions set forth in this Memorandum Opinion and Order, the court concludes that Defendants Beavers, Fulcher, and Grand conspired to unlawfully compete with Pelsue Co. by: (1) infringing on the 482 patent; (2) breaching the fiduciary duty and the duty of loyalty owed by Beavers to Pelsue Co.; (3) interfering with Aguilar's contract with Pelsue Co.; and (4) making false representations regarding Grand's competition with Pelsue Co. products. The evidence demonstrates that there was a meeting of the minds between the Defendants, there were numerous unlawful steps taken to accomplish competition with Pelsue Co. products, and Pelsue Co. suffered damages as the proximate result.

■ All co-conspirators are jointly and severally liable for damages proved in a conspiracy. *Julius Hyman & Co.*, 123 Colo. at 618, 233 P.2d at 1005–06. There-

fore, Beavers, Fulcher, and Grand shall be held jointly and severally liable for any damages awarded under the First, Fourth, Seventh, and Eleventh Claims for Relief. However, the damages caused by this conspiracy between Beavers, Fulcher, and Grand are duplicative of the damages awarded to Pelsue Co. under the First, Fourth, Seventh, and Eleventh Claims for Relief. Therefore, no additional damages will be awarded under this Ninth Claim for Relief.

### B. Patent Infringement Claims

35 U.S.C. § 271(a) provides that "... whoever without authority makes, uses or sells any patented invention, within the United States during the Term of the patent therefor, infringes the patent." Pelsue Co.'s First Claim for Relief alleges that both the 482 and the 748 patents are "infringed by the manufacture, use and/or sale in the United States" of the Grand LH Series tents. Pelsue Co.'s Second Claim for Relief alleges that Defendants Beavers and Fulcher are jointly and severally liable with Grand for infringement of the 482 and 748 patents. Under both the First and Second Claims for Relief, Pelsue Co. alleges that the infringement was willful, thus rendering this case "exceptional" pursuant to 35 U.S.C. § 285 and entitling Pelsue Co. to: (1) enhanced damages up to three times the award of actual damages, pursuant to 35 U.S.C. § 284; and (2) attorneys fees and expenses, including fees and expenses for experts and consultants.

■ A patent is presumed valid and a party challenging the validity of the patent must establish invalidity by clear and convincing evidence. 35 U.S.C. § 282; *Medtronic, Inc. v. Intermedics, Inc.*, 799 F.2d 734, 741 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1033, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987). The validity of the 482 and 748 patents is not at issue in this case. Having assigned the patents to Pelsue Co., Beavers and the parties in privity with him are estopped from challenging the validity of the patents under the doctrine of assignor estoppel. *Shamrock Technologies v. Medical Sterilization*, 903 F.2d 789, 793 (Fed.

Cir.1990); *see Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224–25 (Fed. Cir.1988), *cert. dismissed*, 487 U.S. 1265, 109 S.Ct. 28, 101 L.Ed.2d 978 (1988). In granting the preliminary injunction on November 19, 1990, the court ruled that Defendants Grand and Beavers were estopped from asserting that the 482 patent is invalid. Prior to the trial, the Defendants abandoned the defense of invalidity. The court concludes, therefore, that the 482 and 748 patents are valid.

■ Analysis of whether a patent claim has been literally infringed requires two inquiries: (1) a determination of the scope of the claim as a matter of law, and (2) a factual finding whether the properly construed claim encompasses the accused product. *Texas Instruments v. U.S. International Trade Commission*, 805 F.2d 1558, 1562 (Fed.Cir.1986), *reh. denied*, 846 F.2d 1369 (Fed.Cir.1988); *Moeller v. Ionetics, Inc.*, 794 F.2d 653, 656 (Fed.Cir.1986); *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452–53 (Fed.Cir.1985); *Atlas Powder Co. v. E.I. Du Pont de Nemours & Co.*, 750 F.2d 1569, 1579 (Fed.Cir. 1984); *McGill, Inc. v. John Zinc & Co.*, 736 F.2d 666, 671 (Fed.Cir.1984), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). The law of infringement requires that the asserted claims be compared with the product accused of infringement. *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482–82 (Fed.Cir.1984). Literal infringement requires that the accused device embody every element of the patent claim as properly interpreted. *Mannesman Demag Corp. v. Engineered Metal Products Co.*, 793 F.2d 1279, 1282 (Fed.Cir. 1986). Claim interpretation is a question of law and involves a review of the specification, the prosecution history, the claims (including unasserted as well as asserted claims), and, if necessary, other extrinsic evidence, such as expert testimony. *Hormone Research Foundation, Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1562 (Fed.Cir. 1990), *cert. dismissed*, — U.S. —, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991); *Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d 861, 866– 67 (Fed.Cir.1985).

Since 1962, Pelsue Co. has been engaged in the business of manufacturing and selling equipment used by utility companies for working on outside plant facilities. Among Pelsue Co.'s most successful products is its light-weight, free-standing, collapsible tent, the Pelsue Model 6500 Series Ground Tent (Exhibit 34). This tent has a unique, integral, snap-fold frame, can be set up and taken down quickly, and offers durable weather protection for utility workers and their equipment.

Pelsue Co. is the owner of numerous patents relating to products that it manufactures and sells, including U.S. Patents No. 3,810,482, entitled "Collapsible Tent and Frame Therefor" (the 482 patent) and 4,637,748, entitled "Hub and Strut–Endcap Assembly for Tent Frame Struts" (the 748 patent). (Exhibits 30, 155, and 157). Defendant Beavers invented and patented the tent and the hub that are the subjects of the 482 and 748 patents. Beavers assigned the patents to Pelsue Co. (Exhibits 33 and 156). The 482 and 748 patents on this tent and its hub assembly (Exhibit 158) are valuable assets of Pelsue Co. Louis A. Kemnitz, an expert in utility market research, testified that Pelsue Co. has obtained a major market share in the utility industry, especially in the market for collapsible tents. Almost all utility companies consider the Pelsue Co. 482 patent tent the standard of the industry. Since the issuance of the 482 patent, Pelsue Co. has sold thousands of these collapsible tents. Prior to this case, no one had previously infringed Pelsue Co.'s tent patents. The 482 patent expired on May 14, 1991.

### 1. The 482 Patent

■ On November 19, 1990, the court granted a preliminary injunction against Defendants Grand and Beavers for infringement of the 482 patent. The 482 patent makes twelve claims. The issues in this case are limited to claims 1, 3, 4, 5, 6, and 8. Claims 1 and 8 are independent claims. Claims 3, 4, 5, and 6 are dependent claims, dependent upon claim 1. Claim 1 describes a tent which comprises:

"at least four collapsible subframe assemblies pivotally interconnected at their common corners to define a roof frame bounded on at least three sides by upstanding wall frames,

each of said subframes including

a pair of diagonally extending inwardly folding jointed struts arranged in crossed relation,

stop forming connector means located at the intersection of each strut pair hingedly interconnecting the jointed sections thereof together for limited relative pivotal movement between an inwardly folded one and a fully unfolded position wherein the sections of each strut bear an angular relationship to one another that exceeds 180° and is less than approximately 220° and means comprising a stretchable cord tensioned between the remote ends of adjacent strut sections in the same subframe,

said cord defining a continuous generally rectangular loop therearound adapted to cooperate with the stop forming connector at the intersection thereof to releasably maintain same in fully unfolded position; and

a foldable fabric defining a covering for at least one of the subframes,

said covering having the marginal areas thereof provided with loop-forming elements positioned and adapted to receive and retain the lengths of tensioned cord extending between the ends of the subframe strut sections thus producing a unitary assembly with the collapsible frame defined by the subframes."

(Exhibit 31). Claim 3 comprises:

"The tent set forth in claim 1 in which: the front of the tent is left without a subframe; and, in which the covering extends over the top and down all four sides, that portion of the covering on the front being slit to define an entryway."

(Exhibit 31). Claim 4 comprises:

"The tent set forth in claim 1 in which: the stop forming connector means holds

the strut sections at an angle of approximately 200° when fully extended."

(Exhibit 31). Claim 5 comprises:

"The tent as set forth in claim 1 in which: the loop forming elements in the marginal areas of the covering comprise a double thickness of fabric stitched to define a tunnel-like passage sized to receive the cord."

(Exhibit 31). Claim 6 comprises:

"The tent as set forth in claim 1 in which: the remote ends of adjacent strut sections in the roof frame are spaced apart the same distance as the corresponding remote strut section ends of the wall frames with which they pivotally connect at the common corners."

(Exhibit 31). Claim 8 comprises:

"The subcombination of a collapsible free-standing tent frame for use with a foldable fabric canopy to define a tent which comprises: at least four collapsible subframe assemblies pivotally interconnected at their common corners to define a roof frame bounded on at least three sides by upstanding wall frames,

each of said subframes including

a pair of diagonally extending inwardly folding jointed struts arranged in crossed relation,

stop forming connector means located at the intersection of each strut pair hingedly interconnecting the jointed sections thereof together for limited relative pivotal movement between an inwardly folded one and a fully unfolded position wherein the sections of each strut bear an angular relationship to one another that exceeds 180° and is less than approximately 220°,

and means comprising a stretchable cord tensioned between the remote ends of adjacent strut sections in the same subframe,

said cord defining a continuous generally rectangular loop therearound adapted to cooperate with the stop forming connector at the intersection

thereof to releasably maintain same in fully unfolded position."

(Exhibit 31).

The Defendants argue that there is no literal infringement of the 482 Patent for three reasons. First, Defendants contend that the Grand hub does not exceed 180° and, therefore, the hub or hinge and the sections of each strut do not bear an angular relationship to one another exceeding 180° and less than approximately 220°, as described in claim 1. The court disagrees. A review of the patent claims and all the evidence presented at the preliminary injunction hearing and the trial reveals that the Grand LH Series tent struts do form an angular relationship between the struts and the center hub of more than 180° and less than approximately 220°. (Exhibit 35).

Second, the Defendants contend that the 482 patent is not infringed because the Grand LH Series tent does not contain a means comprising a stretchable cord tensioned between the remote ends of adjacent strut sections in the same subframe, as described in claim 1. Again, the court disagrees. Dr. Paulson indicated that the fabric of the Grand LH Series tent was capable of performing precisely the same function as the stretchable cord in the Pelsue Co. tent (Exhibit 315). The evidence indicates that the function of the stretchable cord tensioned between the remote ends of the adjacent strut sections is literally performed by the stretchable fabric of the hem of the Grand LH Series tent.

Third, the Defendants contend that the 482 patent is not infringed because the Grand LH Series tent does not have rigid struts. The court notes that claims 1 and 8 mention "struts," not "rigid struts." The Grand tent contains struts, albeit flexible struts. Demonstrations in the courtroom revealed that the Grand LH Series tent can also be erected using rigid struts (Exhibit 36). However, the court does not base its conclusion upon that demonstration, but upon the patent claims. *See Amstar*, 730 F.2d at 1482–82. The 482 patent simply indicates that the Pelsue Co. tent contains "struts". The court concludes that the

Grand LH Series tent has struts as claimed in the 482 patent.

Although the court finds that the elements of the 482 patent discussed above are all present in the Grand LH Series tent, the court finds that one essential element is not present in the Grand tent. The first paragraph of claim 1 describes "at least four collapsible subframe assemblies *pivotally interconnected at their common corners....*" (Emphasis added). The subframe assemblies of the Grand LH Series tent do not literally pivotally connect at their corners. The strut section ends of the Grand tent fit into three separate fabric pockets attached to the inside of the corner of the tent. (*See* Exhibit 35). Literal infringement requires that the accused device embody every element of the patent claim as properly interpreted. *Mannesman,* 793 F.2d at 1282. Because the element requiring the subframe assemblies *to* be "pivotally interconnected at their common corners" does not exist in the Grand LH Series tent, the court concludes that the Grand LH Series tent does not literally infringe claim 1 of the 482 patent.

■ One may infringe an independent claim and not infringe a claim dependent on that claim, but the reverse is not true. *Wahpeton Canvas Co., Inc. v. Frontier, Inc.,* 870 F.2d 1546, 1552 n. 9 (Fed.Cir. 1989). As to claims 3, 4, 5, and 6, because the court has concluded that the essential claim 1 of the 482 patent is not literally infringed by the Grand LH Series tent, these dependent claims cannot be literally infringed by the Grand LH Series tent.

With regard to claim 8, the court finds that the Grand LH Series tent is a collapsible free standing tent frame for use with a foldable fabric canopy to define the tent. It has four collapsible subframe assemblies, three sides, and a roof. The Grand LH Series tent has a stop forming connector means located at the intersection of the struts hinged in such a manner that the jointed sections are connected together and are limited in their pivotal movement between the inward folded position and the fully unfolded position to the extent that the struts bear an angular relationship to one another in excess of 180° but less than 220°. (See Exhibit 35). The "means comprising a stretchable cord tensioned between the remote ends of adjacent strut sections in the same subframe" is likewise present in the Grand LH Series tent. Although the Grand LH Series tent does not specifically have a cord as indicated in claim 1, the Grand tent has a stretchable hem. The "means comprising a stretchable cord ... said cord defining the continuous generally rectangular loop" called for in claim 8 "to cooperate with the stop forming connector at the intersection thereof" to maintain the fully unfolded position is the hem of the tent. The function of the "means comprising a stretchable cord" is performed by the equivalent hem of the Grand LH Series tent. (Exhibit 315).

However, as the court concluded above with regard to claim 1, the Grand LH Series tent subframe assemblies are not literally "pivotally interconnected at their common corners." The strut section ends of the Grand tent fit into separate pockets and are not pivotally interconnected as described in claim 8 of the 482 patent. Accordingly, the court concludes that the Grand LH Series tent does not literally infringe claim 8 of the 482 patent.

*a. The Doctrine of Equivalents*

■ The determination of no literal infringement does not end the infringement inquiry in this case. Even if there is no literal infringement, there may be infringement under the doctrine of equivalents. This doctrine provides that an accused product infringes if it performs substantially the same overall function in substantially the same way to yield substantially the same result. *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950); *Hormone Research,* 904 F.2d at 1564; *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 934 (Fed.Cir.1987), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). Only if all limitations of the claim are satisfied at least equivalently can it be found that the two devices work in substantially the same way. *Bec-*

*ton Dickinson and Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 798 (Fed.Cir.1990). In the case of infringement under the doctrine of equivalents, the accused device is compared with the claimed invention as a whole. *Texas Instruments,* 805 F.2d at 1571.

■■■ The prosecution history, the other claims in the patent, expert testimony, the language of the asserted claims, and the pioneer status of the invention may all be considered in addition to the specifications. *Texas Instruments,* 805 F.2d at 1568. Equivalence does not require complete identity for every purpose and in every respect. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. *Graver Tank,* 339 U.S. at 609, 70 S.Ct. at 857.

■■■ The evidence indicated and the court accepts that the 482 patent was a pioneering patent, that is, new art as opposed to merely an improvement on existing art. Therefore, the 482 patent is entitled to a broad range of equivalents. *Texas Instruments v. U.S. International Trade Com'n,* 846 F.2d 1369, 1370 (Fed.Cir. 1988); *Thomas & Betts Corp. v. Litton Systems, Inc.,* 720 F.2d 1572, 1580 (Fed.Cir. 1983).

■■■ A review of the Grand LH Series tent and the patent indicates that the Grand LH Series tent performs substantially the same overall function in substantially the same way to yield substantially the same result. *See Graver Tank,* 339 U.S. at 608, 70 S.Ct. at 856; *Hormone Research,* 904 F.2d at 1564. The Grand LH Series tent has struts that fit into pockets at common corners in a manner equivalent to being pivotally interconnected. The struts form an angular relationship to one another that exceeds 180° and is less than approximately 220°. The means comprising a stretchable cord is performed by the stretchable fabric of the tent hem. The stretchable hem defines a generally rectangular loop that cooperates with the stop forming connector. Compared with the claimed invention as a whole, the Grand LH

Series tent infringes the 482 Patent under the doctrine of equivalents.

### b. Prosecution History Estoppel

■■■ The Defendants argue that Pelsue Co. is estopped from arguing a broad interpretation of the 482 patent claim in alleging infringement when it previously argued a narrow construction of the same patent claim during prosecution. *Coleco Industries v. United States Int'l. Trade Comm'n,* 573 F.2d 1247, 1256–57 (C.C.P.A. 1978). The Defendants' position is that Pelsue Co. is estopped from asserting that Grand's LH Series tent is equivalent to the claimed elements of the 482 patent because those claimed elements were previously given up by a contrary argument made during prosecution. (See Exhibit S–4 pp. 25–28).

■■■ Prosecution history estoppel is a judicially accepted limitation to the doctrine of equivalents. Under that limitation, a patentee cannot recapture through equivalence certain coverage given up by argument or amendment during prosecution. *Hormone Research,* 904 F.2d at 1564; *Loctite,* 781 F.2d at 870. That is not to say, however, that whenever a limiting amendment or argument is made during prosecution, the patentee loses all coverage between what the claims literally cover and what they would have covered prior to the amendment or argument. *Hormone Research,* 904 F.2d at 1564. Depending on the nature and purpose of an amendment, it may have a limiting effect within a spectrum ranging from great to small to zero. *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362–63 (Fed.Cir.1983).

■■■ The court rejects the Defendants' prosecution history estoppel argument, recognizing that prosecution history estoppel is not to be a wooden application of estoppel that virtually negates the doctrine of equivalents and confines the patentee strictly to the letter of the limited claims granted. *Graver Tank,* 339 U.S. at 605, 70 S.Ct. at 854; *Hughes Aircraft,* 717 F.2d 1351, 1362–63.

### 2. The 748 Patent

■ Pelsue Co. alleges that the Grand Loc–Hinge (Exhibit H–7) infringes claims 1, 3, and 8 of the 748 patent. Claim 1 is an independent claim. Claims 3 and 8 are dependent upon claim 1. Claim 1 of the 748 patent claims:

"The self-adjusting hub and strut-endcap assembly for tent frame roof and wall struts which comprises:

a hub two piece member shaped and joined together to provide four ball-receiving sockets arranged in equi-angularly-spaced relation around the center thereof

with each such socket adapted to receive and retain a ball for universal movement therein, and

said hub member including side-opening channel-forming entryways leading into each socket,

said entryways each having divergent sidewalls bordering a pair of intersecting seats at the base thereof bearing an acute angular relation to one another,

one of said pair of seats extending radially outward from its ball-receiving socket

while the other of said paired seats is skewed with respect to said radially-extending one,

and diametrically-located pairs of said entryways having their skewed seats opposite one another;

and four strut-endcap elements each having a ball on the inner end thereof and a tubular sleeve projecting outwardly from said ball for receiving the inner end of a tent frame strut,

said ball when seated in a ball-receiving socket in the hub being shaped and adapted to align the sleeve depending therefrom for limited side-to-side movement between a first position seated in the radially-extending seat of the flared entryway and a second position seated in the skewed seat thereof, said hub member and strut-endcap elements cooperating with one another in assembled relation with the sleeves seated in their first positions to define

an assembly specifically adapted to the formation of a square wall or roof frame, and said member and elements cooperating with said sleeves seated in their second positions to define a four-sided polygonal frame having at least two unequal sides."

(Exhibits 155 and 157). Claim 3 comprises:

"The hub and strut-endcap assembly as set forth in claim 1 wherein: the side-walls of the entryways define fixed abutments effective to limit the side-to-side movement of the endcap sleeves."

(Exhibits 155 and 157). Claim 8 comprises:

"The hub and strut-endcap assembly as set forth in claim 3 wherein: the side-walls of the entryway diverge at an angle no greater than approximately 15°."

(Exhibits 155 and 157).

The court finds that the Grand Loc–Hinge does not have divergent sidewalls bordering a pair of intersecting seats at their base bearing an acute angular relation one to another with one of the pair of seats extending radially outward from its ball-receiving socket while the other of the said paired seat is skewed with respect to the radially extending one, as described in claim 1 of the 748 patent. (*See* Exhibit H–7). Neither does the Grand Loc–Hinge have diametrically-located pairs of entryways having their skewed seats opposite one another. The Grand Loc–Hinge operates through a center pivot and utilizes two separate subassemblies, bolted together to make two separate strut planes, each containing two receiving sockets. The Grand Loc–Hinge subassemblies are joined together by means of a center bolt, thus allowing synchronized rotational movement of the struts secured within each subassembly. (*See* Exhibit H–7).

Nor does the Grand Loc–Hinge allow side-to-side movement between the first radial position to the second skewed position in the skewed seat, as described in claim 1 of the 748 patent. Claim 1 of the 748 patent requires a ball and ball-receiving socket that allow rotation from the radial position to the skewed position by virtue of movement within the socket, "said ball when seated in a ball-receiving socket in

the hub being shaped and adapted to align the sleeve depending therefrom for *limited side-to-side movement."* (Emphasis added). The entire Grand Loc–Hinge swivels around a center pivot that provides all necessary strut movement. (*See* Exhibit H–7).

The Grand Loc–Hinge does not have a pair of intersecting seats, does not have divergent sidewalls, and is not designed to allow side-to-side movement of the struts. The court concludes that the Grand Loc–Hinge does not literally infringe claim 1 of the 748 patent. Accordingly, the Grand Loc–Hinge cannot literally infringe claims 3 and 8, the claims dependent upon claim 1 of the 748 patent.

#### a. *The Doctrine of Equivalents*

With regard to the doctrine of equivalents, the court finds that the Grand Loc–Hinge consists of two separate parts which shift on a simple axis to allow the struts to assume the first radial position or the second skewed position. The Grand Loc–Hinge uses a center pivot to obtain relative strut movement and positioning. This differs from the 748 patent which allows limited side-to-side movement of the ball in the ball-receiving socket to position the struts between the first radial position and the second skewed position. The Grand Loc–Hinge struts are securely fastened within the strut retaining sockets and are not designed to allow side-to-side movement. The 748 patent requires divergent sidewalls, intersecting seats, and an upper and lower piece forming together to create a single unitary plane hub with four strut receiving sockets, all working together to facilitate relative strut positioning. Although the Grand Loc–Hinge performs a similar function in a similar manner, it does not perform substantially the same function in substantially the same manner to achieve substantially the same result. Therefore, the Grand Loc–Hinge does not infringe the 748 patent under the doctrine of equivalents. *See Hormone Research,* 904 F.2d at 1564.

#### 3. Damages

Under 35 U.S.C. § 284, Pelsue Co. is entitled to damages adequate to compensate it for patent infringement by the Defendants. Where, as here, a patent holder has actually exploited the lawful patent rights by manufacture, use, or sale, its lost profits caused by the infringement are an appropriate measure of its actual damages. *Kori Corp. v. Wilco Marsh Buggies & Draglines,* 761 F.2d 649, 653 (Fed.Cir.1985), *cert. denied,* 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985); *Trans–World Manufacturing Corp. v. Al Nyman & Sons,* 633 F.Supp. 1047, 1052 (D.Del.1986). A patent owner may prove its lost profits by showing (1) demand for the patented product, (2) absence of acceptable non-infringing substitutes, (3) its manufacturing and marketing capability to exploit the demand, and (4) the amount of profit it would have made. *State Industries, Inc. v. Mor–Flo Industries, Inc.,* 883 F.2d 1573, 1577 (Fed.Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990). Lost profits may take the form of sales diversions, price erosion, or increased expenses. *Trans–World Manufacturing,* 633 F.Supp. at 1052. The patent holder is entitled to damages, for example, for lower sales prices which it had to charge because of the defendants' infringement and for any special discounts it gave to compete with the defendants' pricing practices. *TWM Mfg. Co., Inc. v. Dura Corp.,* 789 F.2d 895, 902 (Fed.Cir.1986), *cert. denied,* 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986).

The court concludes that Pelsue Co. has met its burden on all of the required elements, including the absence of acceptable non-infringing substitutes for the 482 patent. Therefore, the court rejects the Defendants' argument that the proper measure of damages is a reasonable royalty and concludes that Pelsue Co. is entitled to its lost profits.

Pelsue Co.'s damages expert, Mr. Weese, calculated Pelsue Co.'s lost profits until May 14, 1991, the date that the 482 patent expired. According to Weese's testimony and reports, Pelsue Co.'s lost profits on Grand's tent sales were $178,986.00 plus $25,046.00 interest as of June 25, 1991, the date the trial concluded. (Exhibit 350).

Pelsue Co.'s reduced profit on its own reduced tent sales was $308,789.00 plus $29,575.00 interest as of June 25, 1991. (Exhibit 350).

The Defendants' expert, Mr. Taylor, calculated the damages to be much lower. (Exhibit B–6). Much of Taylor's analysis relied solely on information provided to him by Beavers and Fulcher. Cross-examination at trial revealed that Taylor made inappropriate assumptions in his calculations. For example, in calculating the lost profits on the tents alone, Taylor (by his own admission at trial) omitted more than $100,000.00 in sales of Grand tents by not distinguishing which tent sales were affected by the preliminary injunction. Taylor's calculations "double-counted" labor and factory overhead and substantially underestimated Pelsue Co.'s profit margin. In addition, Taylor's calculations did not go beyond the date of the preliminary injunction. Taylor admitted at trial that, had he not based his calculations on these improper assumptions, his conclusions might have been closer to Weese's conclusions. (*See* Exhibits G–16, G–17).

Pelsue Co. is entitled to both its lost profits on Grand's sales of tents and its reduced profit on its own reduced sales of tents. The evidence indicated that the Grand tent sales would otherwise have been Pelsue Co.'s tent sales. Therefore, Pelsue Co. lost profit on every tent sale included in Weese's calculations. Because Grand was using tents as a "loss leader" to encourage sales of its other products and was on some occasions selling tents below cost, Pelsue Co. was forced to reduce the prices and profit margin of its tents in order to compete with the Grand tents.

With regard to Pelsue Co.'s request for further continuing losses, the court concludes that the evidence of continuing losses is insufficient and declines to award further damages for continuing losses. Specifically, Pelsue Co. argues that before the preliminary injunction was issued, Grand had contracted to sell tent models LHTM6 USW and LHTM8 USW to U.S. West. Pelsue Co. argues that it is entitled to damages in the form of lost profits for the entire period of Grand's contract with U.S. West because the contract was a result of infringement that occurred prior to the expiration of the 482 patent. The court finds the evidence of Grand's contract with U.S. West to be insufficient. Pelsue Co. argues that the proposal for ground tents (Exhibit 198 pp. 1–15) and the agreement with Mtn. Utility signed by Utech only (Exhibit 198 pp. 16–34) constitute Grand's contract with U.S. West. The agreement was never signed by U.S. West, although Utech testified that he sold one to two hundred tents to U.S. West. Neither was the agreement dated, nor was a term of the agreement set forth. The court concludes that the evidence of Grand's contract with U.S. West is insufficient to support an award to Pelsue Co. of continuing lost profits.

The court concludes that Pelsue Co. is entitled to $204,032.00 for its lost profits on Grand's sales of tents and $338,364.00 for its reduced profit on its own reduced sales of tents, for a total of $542,396.00.

### 4. Willful Infringement

■ A finding of willful infringement will support an award of increased damages pursuant to 35 U.S.C. § 284. *Bott v. Four Star Corp.*, 807 F.2d 1567, 1574 (Fed. Cir.1986); *American Original Corp. v. Jenkins Food Corp.*, 774 F.2d 459, 464 (Fed.Cir.1985); *Lam, Inc. v. Johns–Manville Corp.*, 668 F.2d 462, 474 (10th Cir. 1982), *cert. denied*, 456 U.S. 1007, 102 S.Ct. 2298, 73 L.Ed.2d 1302 (1982). Pursuant to 35 U.S.C. § 284, the court has discretion to increase the damages up to three (3) times the amount found or assessed. *Acoustical Design, Inc. v. Control Electronics Co., Inc.*, 932 F.2d 939, 942 (Fed.Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 185, 116 L.Ed.2d 146 (1991); *Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2017, 114 L.Ed.2d 103 (1991).

■ In determining whether the Defendants' infringement was willful so as to warrant the increase in damages awarded against them, the court must consider the totality of the circumstances, including: (1) whether the infringers deliberately copied

the ideas or design of another; (2) whether the infringers, when they knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; and (3) the infringers' behavior as parties to the litigation. *Bott*, 807 F.2d at 1572; *U.S. Surgical Corp. v. Hospital Products International Pty. Ltd.*, 701 F.Supp. 314, 351 (D.Conn.1988). There is no apparent requirement that bad faith be proven before damages can be enhanced in a willful infringement case. *TWM Mfg. Co.*, 789 F.2d at 902. Questions of credibility and motivation relating to willfulness are within the province of the trier of fact. *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 628 (Fed.Cir. 1985), *cert. dismissed*, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985). The Plaintiff must show willfulness by clear and convincing evidence. *See Power Lift, Inc. v. Lang Tools, Inc.*, 774 F.2d 478, 482 (Fed.Cir.1985).

 Beavers worked at Pelsue Co. for approximately twenty-one (21) years and contributed significantly to the success and growth of Pelsue Co. Beavers was the inventor of more than twenty (20) patents assigned to Pelsue Co., including the 482 and 748 patents. The patented Pelsue Model 6500 Series Ground Tent was a successful, profit-making item for Pelsue Co. The Defendants were aware of Pelsue Co.'s 482 patent before beginning their infringing activities and they knew how important it was for Pelsue Co. to protect its patents from infringement. Beavers served on Pelsue Co.'s board of directors and used information acquired from his long-standing fiduciary relationship with Pelsue Co. to promote Grand's competing products. The Defendants deliberately copied the ideas and design embodied in the 482 patent in order to compete directly with Pelsue's patented product.

Although the Defendants solicited an opinion of a patent attorney, the Defendants did not supply complete pertinent information to the attorney regarding the issue of possible infringement. Beavers represented to the patent attorney that the hem of the Grand LH Series tent did not stretch. The evidence at trial indicated that the hem of the Grand tent does stretch to the extent that it is capable of performing exactly the same function as the stretchable cord in the 482 patent. The patent attorney was not familiar with and did not apprise himself of the state of the art. He testified that he did not look at the prior art patents cited in the 482 patent, nor did he do a prior art search. The Defendants paid the patent attorney only enough for an oral opinion. No written opinion was ever generated. The Defendants have failed to establish reliance on an opinion of counsel sufficient to constitute a defense to willful infringement. *See Bott*, 807 F.2d at 1572; *Dickey-john Corp. v. International Tapetronics Corp.*, 710 F.2d 329, 348 (7th Cir.1983); *U.S. Surgical*, 701 F.Supp. at 351; *Shiley, Inc. v. Bentley Laboratories, Inc.*, 601 F.Supp. 964, 968 (C.D.Cal.1985), *aff'd*, 794 F.2d 1561 (Fed. Cir.1986).

The court has carefully considered the testimony of Defendants Beavers and Fulcher, including inconsistencies, motive, contradictions, bias, personal interest in the case, and demeanor. The court is compelled to conclude that some of the testimony as to material facts in the case was false and should be disregarded.

The evidence presented at trial was sufficient for the court to find that the infringement of the 482 patent was willful and deliberate. Accordingly, the court concludes that the Defendants' infringement of the 482 patent was willful and that Pelsue Co. is entitled to treble damages under 35 U.S.C. § 284. The total of $542,396.00 in damages for infringement of the 482 patent will be trebled, for a total of $1,627,188.00.

### a. Joint and Several Liability

 Officers and directors of a corporate infringer are liable for the corporation's infringement if they exceed their duties and participate directly in the infringing activity, deliberately organize a corporation for the purpose of infringing a patent, or otherwise act as the moving,

active, conscious force behind an infringement. *U.S. Philips Corp. v. National Micronetics, Inc.*, 410 F.Supp. 449, 468 (S.D.N.Y.1976), *aff'd*, 550 F.2d 716 (2d Cir. 1977). A finding of willful or deliberate infringement by an officer or director supplies a valid basis for holding the officer or director jointly liable for infringement by the corporation. *A. Stucki Co. v. Schwam*, 634 F.Supp. 259, 265 (E.D.Pa.1986). Direct participation in the infringing activity by a principal officer of the corporation is a distinct basis for holding him jointly liable with the corporation. An officer or director is jointly liable for infringement where he directed or ordered the infringing method of manufacture or controlled the sale of the infringing goods. *A. Stucki*, 634 F.Supp. at 264–65.

Moreover, corporate officers and directors are liable for inducement of infringement under 35 U.S.C. § 271(b) if they knowingly aided and abetted direct infringement by their corporation. Intent to aid and abet may be established by circumstantial evidence. Exertion of control over a corporation's manufacture of infringing products is evidence of inducement of infringement. *Amicus, Inc. v. Alosi*, 723 F.Supp. 429, 431 (N.D.Cal.1989).

In this case, Fulcher and Beavers organized Grand and made the decision that Grand would begin manufacturing the Grand LH Series tent. Fulcher and Beavers directed and controlled the manufacture and sale of the tents. Fulcher and Beavers were primarily responsible for Grand's infringing activities and were the primary beneficiaries of those activities. Under the standards set forth above, they are individually liable both for direct infringement and for inducement of infringement of the 482 patent.

### 5. Attorneys' Fees

The court in exceptional cases has discretion to award reasonable attorney fees to the prevailing party pursuant to 35 U.S.C. § 285. *Acoustical Design,* 932 F.2d at 942; *Shatterproof Glass*, 785 F.2d at 629; *Lam*, 668 F.2d at 476; *Milgo Electronic Corp. v. United Business Com-*

*munications, Inc.*, 623 F.2d 645, 654 (10th Cir.1980), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); *True Temper Corp. v. CF & I Steel Corp.*, 601 F.2d 495, 508 (10th Cir.1979). Attorneys' fees are awarded to compensate the prevailing party because the losing party's misconduct was so unfair and reckless as to make it unconscionable for the prevailing party to sustain the expense of counsel. *Lam*, 668 F.2d at 476. A case may be deemed exceptional where the infringer's conduct in the marketplace was such as to produce an unnecessary and outcome-certain lawsuit or where the party displayed bad faith in the litigation process. *True Temper*, 601 F.2d at 508; *Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1580–81 (Fed.Cir.1986).

To prevail under this fee shifting provision, the Plaintiff must prove the exceptional character of the case. The quantum of proof required to prove bad faith is clear and convincing evidence. *Reactive Metals Alloys Corp. v. ESM, Inc.*, 769 F.2d 1578, 1582 (Fed.Cir.1985). In some cases, a finding of willful infringement alone may be sufficient to support a finding that the case is "exceptional." *Modine*, 917 F.2d at 543; *Kloster Speedsteel*, 793 F.2d at 1580–81; *Kori Corp.*, 761 F.2d at 657.

The court concludes that the Defendants' willful infringement renders this an "exceptional case" within the meaning of 35 U.S.C. § 285 and that Pelsue Co. is entitled to an award of its reasonable attorneys' fees incurred in this litigation. *See Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed.Cir. 1989). Pelsue Co. will be directed to submit a statement of such reasonable attorneys' fees within ten (10) days after the entry of judgment herein.

### 6. Plaintiff's Motion for Fees Incurred in Connection with the Counterclaim of Grand Enterprises, Inc. for Tortious Interference with Existing and Prospective Contractual Relations

Pelsue Co. seeks recovery for attorneys' fees incurred as a result of Grand's asser-

tion of a counterclaim for tortious interference with existing and prospective contractual relations. Grand ultimately dismissed this counterclaim voluntarily. *See* Motion by Defendant Grand Enterprises, Inc. for Dismissal with Prejudice of its Counterclaim Relating to Tortious Interference, dated May 29, 1991.

The court has determined above that this is an "exceptional case" within the meaning of 35 U.S.C. § 285 and that Pelsue Co. is entitled to an award of its reasonable attorneys' fees incurred in this litigation. The court includes in the definition of "this litigation" Pelsue Co.'s attorneys' fees incurred as a result of Grand's assertion of its counterclaim for tortious interference. Accordingly, Pelsue Co.'s Motion for Fees Incurred in Connection with the Counterclaim of Grand Enterprises, Inc. for Tortious Interference with Existing and Prospective Contractual Relations is GRANTED. Pelsue Co. will be directed to include these fees in the statement of its reasonable attorneys' fees to be submitted within ten (10) days after entry of judgment herein.

### 7. Prejudgment Interest

35 U.S.C. § 284 affords the trial court discretion to award interest and costs to Pelsue Co. in addition to compensatory damages for patent infringement. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655–56, 103 S.Ct. 2058, 2062–63, 76 L.Ed.2d 211 (1983); *Lam v. Johns-Manville Corp.*, 718 F.2d 1056, 1066 (Fed.Cir. 1983); *Milgo*, 623 F.2d at 668. Prejudgment interest should ordinarily be awarded under § 284, absent some justification for withholding such an award. *Devex*, 461 U.S. at 655–56, 103 S.Ct. at 2062–63. A trial court's finding of willful and deliberate infringement provides a basis for an award of prejudgment interest. *Milgo*, 623 F.2d at 668.

Here, the court has made a determination of willful and deliberate infringement. In addition, an award of prejudgment interest would aid in placing Pelsue Co. in the position that it would have been in had the infringement never occurred. Accordingly, prejudgment interest has been included in

the award of damages to June 25, 1991, the date the trial concluded.

### 8. Costs

Fed.R.Civ.P. 54(d) provides that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." *See also* 28 U.S.C. §§ 1821 and 1920. The award of costs is within the trial court's discretion. 35 U.S.C. § 284; *True Temper*, 601 F.2d at 509. The court will award costs, to be limited to those items recoverable under 28 U.S.C. §§ 1821 and 1920. Plaintiff will be directed to submit its Bill of Costs to the Clerk of the Court on or before 10 days after the entry of judgment herein.

Pelsue Co. seeks to recover expert witness and consultant fees and travel expenses incurred during and in preparation for trial. The court may not exceed the statutory limitation on expert witness fees contained in 28 U.S.C. §§ 1821 and 1920. *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987); *Templeman v. Chris Craft Corp.*, 770 F.2d 245, 250 (1st Cir. 1985), *cert. denied*, 474 U.S. 1021, 106 S.Ct. 571, 88 L.Ed.2d 556 (1985); *Cleverock Energy Corp. v. Trepel*, 609 F.2d 1358 (10th Cir.1979), *cert. denied*, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980); *Schmid v. Frosch*, 609 F.Supp. 490, 493 (D.D.C. 1985); *Westman Comm'n Co. v. Hobart Corp.*, 562 F.Supp. 729, 737 (D.Colo.1983), *rev'd on other grounds*, 796 F.2d 1216 (1986). Pelsue Co.'s expert witness and consultant fees and travel expenses incurred during and in preparation for trial will be limited to those items recoverable under 28 U.S.C. §§ 1821 and 1920.

### 9. Injunctive Relief

Pelsue Co. argues that injunctive relief is required in order to make Pelsue Co. whole. Pelsue Co. bases its argument for injunctive relief on the Defendants' alleged: (1) violation of a covenant not to compete; (2) interference with Pelsue Co.'s business relationships; (3) misuse of trade secrets and other confidential and proprietary information; and (4) breach of fiduciary duties. Pelsue Co. argues that only an injunction restraining the Defendants from

competing with Pelsue Co. for four (4) years "will suffice to deprive defendants of the 'window of opportunity' which they created for themselves at Pelsue's expense." The court disagrees.

Pelsue Co. has prevailed on only one of the theories supporting its request for an injunction, that is, the claim for breach of fiduciary duty and the duty of loyalty. In addition, as further set forth in this Memorandum Opinion and Order, there is no sufficient proof of continuing losses. The evidence indicated that after the November 19, 1990 preliminary injunction, Pelsue Co. immediately recovered its market position. In the absence of evidence of the use of trade secrets or confidential information, the court declines to grant an injunction against the Defendants for breach of fiduciary duties. *See Riback Enterprises, Inc. v. Denham,* 452 F.2d 845, 849 (2d Cir.1971). The evidence indicates that after the November 19, 1990 preliminary injunction, Pelsue Co. immediately recovered its market position. The court cannot conclude that the damages awarded do not make Pelsue Co. whole in the absence of injunctive relief.

## IV. ORDER

1. Partial judgment shall enter in favor of Plaintiff Pelsue Co. and against Defendants Beavers, Fulcher, and Grand Enterprises, Inc. on the First and Second Claims for Relief for the 482 patent only. Damages shall be awarded in the amount of $1,627,188.00.

2. Partial judgment shall enter in favor of Defendants Beavers, Fulcher, and Grand Enterprises, Inc. and against Plaintiff Pelsue Co. on the First and Second Claims for Relief for the 748 patent only.

3. A Stipulated Consent Judgment was entered on September 20, 1990 in favor of Plaintiff Pelsue Co. and against Defendant Don A. Aguilar on the Third Claim for Relief.

4. Partial judgment was entered on November 16, 1990 in favor of Plaintiff Pelsue Co. and against Defendant Grand Enterprises, Inc. on the Fourth Claim for Relief. No additional damages are awarded under this Fourth Claim for Relief.

5. The Fifth Claim for Relief was dismissed at trial. Partial judgment shall enter in favor of Defendants Beavers, Fulcher, and Grand Enterprises, Inc. and against Plaintiff Pelsue Co. on the Fifth Claim for Relief.

6. The Sixth Claim for Relief was dismissed at trial. Partial judgment shall enter in favor of Defendants Beavers, Fulcher, and Grand Enterprises, Inc. and against Plaintiff Pelsue Co. on the Sixth Claim for Relief.

7. Partial judgment shall enter in favor of Plaintiff Pelsue Co. and against Defendants Beavers on the Seventh Claim for Relief in the amount of: (1) $379,178.60 for Pelsue Co.'s lost profits; and (2) $76,855.00 for compensation paid to Beavers pursuant to Exhibit B plus interest compounded monthly beginning February 1, 1987 through June 25, 1991.

8. The Eighth Claim for Relief was dismissed at trial. Partial judgment shall enter in favor of Defendants Beavers and Fulcher and against Plaintiff Pelsue Co. on the Eighth Claim for Relief.

9. Partial judgment shall enter in favor of Plaintiff Pelsue Co. and against Defendants Beavers, Fulcher, and Grand Enterprises, Inc. on the Ninth Claim for Relief. Defendants Beavers, Fulcher, and Grand Enterprises, Inc. shall be jointly and severally liable for the damages awarded under the First, Fourth, Seventh, and Eleventh Claims for Relief. The damages are duplicative of the damages awarded under the First, Fourth, Seventh, and Eleventh Claims for Relief. No additional damages shall be awarded under this Ninth Claim for Relief.

10. The Tenth Claim for Relief was dismissed at trial. Partial judgment shall enter in favor of Defendant Beavers and against Plaintiff Pelsue Co. on the Tenth Claim for Relief.

11. Partial judgment shall enter in favor of Plaintiff Pelsue Co. and against Defendants Beavers, Fulcher, and Grand Enterprises, Inc. on the Eleventh Claim

for Relief. The damages are duplicative of the damages awarded under the First, Seventh, and Ninth Claims for Relief. No additional damages shall be awarded under this Eleventh Claim for Relief.

12. The Twelfth Claim for Relief was dismissed at trial. Partial judgment shall enter in favor of Defendants Fulcher and Grand Enterprises, Inc. and against Plaintiff Pelsue Co. on the Twelfth Claim for Relief.

13. Judgment shall enter in favor of Defendant Beavers and against Plaintiff Pelsue Co. on the First Counterclaim in the amount of $35,000.00 plus interest dating from May 3, 1989.

14. Judgment shall enter in favor of Plaintiff Pelsue Co. and against Defendants Beavers, Fulcher, and Grand Enterprises, Inc. for Pelsue Co.'s reasonable attorneys' fees incurred in this litigation. Pelsue Co. is DIRECTED to submit a statement of such reasonable attorneys' fees within ten (10) days after the entry of judgment herein.

15. Plaintiff's Motion for Fees Incurred in Connection with the Counterclaim of Grand Enterprises, Inc. for Tortious Interference with Existing and Prospective Contractual Relations is hereby GRANTED. Pelsue Co. is DIRECTED to include these reasonable attorneys' fees in the statement to be submitted pursuant to ¶ 14, above.

16. Plaintiff Pelsue Co. is hereby awarded prejudgment interest to June 25, 1991.

17. Plaintiff Pelsue Co. is hereby awarded its costs pursuant to 28 U.S.C. §§ 1821 and 1920. Pelsue Co. is DIRECTED to submit its Bill of Costs to the Clerk of the Court within ten (10) days after the entry of judgment herein.

DATED at Denver, Colorado this 30th day of December, 1991, *nunc pro tunc* June 25, 1991.